SOUTHMARK PRIME PLUS, L.P., a Delaware Limited Partnership; Southmark Equity Partners III, Ltd., a California Limited Partnership; Southmark Investment Group 86, Inc., a Nevada Corporation; and Prime Plus Corp., Inc., a Nevada Corporation, Plaintiffs,

v.

Leonard F. FALZONE; Buffalo Laborers' Pension Fund; Laborers' International Union of North America, Local # 210; RealCap Company, a Texas General Partnership; Quantum Realty Corp., a Delaware Corporation; ConCap Management, L.P., an Illinois Limited Partnership; William R. Arnold; Salvatore J. Caci; Louis P. Ciminelli; John A. Doyle; Peter G. Gerace; Edward D. Herrick; James C. Logan; Terry L. Noebel; Joseph R. Pieri; Robert C. Patterson; and Daniel J. Sansanese, Defendants.

Civ. A. No. 91–127–JLL.

United States District Court, D. Delaware.

Oct. 10, 1991.

Robert K. Payson and Stephen C. Norman of Potter, Anderson & Corroon, Wilmington, Del., and Karen E. Katzman, Phillip A. Geraci, John J.P. Howley, and Jill K. Israelof of Kaye, Scholer, Fierman, Hays & Handler, New York City, of counsel, for plaintiffs.

Richard R. Wier, Jr., Wayne J. Carey, and April Caso Ishak of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., and Harold J. Boreanaz and Robert L. Boreanaz of Boreanaz, Carra, Boreanaz, Buffalo, N.Y., of counsel, for Pension Fund defendants.

Perry F. Goldlust of Heiman, Aber & Goldlust, Wilmington, Del., and Richard Lipsitz and William M. Feigenbaum of Lip-

sitz, Green, Fahringer, Roll, Salisbury & Cambria, Buffalo, N.Y., of counsel, for Local #210 defendants.

Steven J. Rothschild, Matthew F. Boyer and Karen L. Valihura of Skadden, Arps, Slate, Meagher & Flom, Wilmington, Del., and David S. Steuer of Wilson, Sonsini, Goodrich & Rosati, Palo Alto, Cal., of counsel, for RealCap defendants.

## OPINION

LATCHUM, Senior District Judge.

This is an action brought by two real estate limited partnerships and their managing general partners against a host of defendants, alleging violations of the federal securities laws and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), arising from a threatened proxy contest. This is not the first suit between the parties, and possibly not the last. The facts of this case are involved and will be addressed in greater detail *infra* at section II.A.

The case is presently before the Court on the defendants' motion to dismiss on the pleadings pursuant to Federal Rule of Civil Procedure 12(c)[1] and the plaintiffs' motion for leave to file a supplemental complaint. After considering the briefs of the parties, and hearing oral argument on September 13, 1991, the Court will grant the defendants' motion in part and deny it in part and will deny the plaintiffs' motion for leave to file a supplemental complaint.

**1.** On May 14, 1991 RealCap, Quantum Realty Corp., ConCap Management, L.P., John A. Doyle, Edward D. Herrick and Terry L. Noebel jointly moved for a dismissal of this action under Federal Rule of Civil Procedure 12(c). (Docket Item [D.I.] 45.) The remaining defendants, Buffalo Laborers' Pension Fund, Laborers' International Union of North America Local #210, Leonard F. Falzone, William R. Arnold, Salvatore J. Caci, Louis P. Ciminelli, Peter G. Gerace, James C. Logan, Joseph R. Pieri, Robert C. Patterson and Daniel J. Sansanese, joined the motion to dismiss on June 12, 1991 and August 5, 1991. (D.I. 53 & 73.)

The plaintiffs in this action are Southmark Prime Plus, L.P.; Southmark Equity Partners

## I. THE APPLICABLE STANDARD UNDER RULE 12(C)

The defendants have moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).[2] Since Rule 12(c) provides for the summary disposition of a party's claims on the merits before discovery, such motions are disfavored. *Cardio-Medical Assoc., Ltd. v. Crozer-Chester Medical Ctr.*, 536 F.Supp. 1065, 1072 (E.D.Pa.1982). Like Rule 12(b)(6), Rule 12(c) requires that the Court "accept the allegations in the complaint as true, and draw all reasonable factual inferences in favor of the plaintiff. [The motion can be granted] only if no relief could be granted under any set of facts that could be proved." *Turbe v. Government of the Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991) (citation omitted); *see also Summit Health, Ltd. v. Pinhas*, —— U.S. ——, 111 S.Ct. 1842, 1845, 114 L.Ed.2d 366 (1991); *Cardio-Medical*, 536 F.Supp. at 1072 ("If a complaint contains even the most basic of allegations that, when read with great liberality, could justify plaintiff's claim for relief, motions for judgment on the pleadings should be denied."). The Court need not, however, adopt "conclusory allegations or statements of law." *In re General Motors Class E Stock Buyout Sec. Litig.*, 694 F.Supp. 1119, 1125 (D.Del.1988). Where appropriate, the Court may grant a Rule 12(c) motion for judgment on the pleadings in part, and deny it in part. *See, e.g., Society Hill Civic Ass'n v. Harris*, 632 F.2d 1045 (3d Cir.1980).

Turning more specifically to the issue before the Court, on a motion for judg-

III, Ltd.; Southmark Investment Group 86, Inc. and Prime Plus Corp., Inc.

**2.** Federal Rule of Civil Procedure 12(c) states:

**Motion for Judgment on the Pleadings.** After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all materials made pertinent to such a motion by Rule 56.

ment on the pleadings, as with motions to dismiss pursuant to Rule 12(b), the Court is not strictly limited to the facts addressed in the pleadings; the Court may take judicial notice of additional facts where appropriate. *MGIC Indemnity Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir.1986) ("On a motion to dismiss, we may take judicial notice of matters of public record outside the pleadings.") (citations omitted); *Phillips v. Bureau of Prisons,* 591 F.2d 966, 969 (D.C.Cir.1979) (on defendant's motion to dismiss, the Court will consider factual allegations of complaint and matters of general public record); *see, e.g., Huntt v. Government of the Virgin Islands,* 339 F.2d 309, 310 (3d Cir.1964) (taking judicial notice of certain facts on a Rule 12(c) motion).

■ Despite the language of Rule 12(c), the consideration of the judicially noticed facts does not convert the motion into a Rule 56 motion for summary judgment. It is only when the Court goes beyond the pleadings and judicially noticed facts that the Court must convert the motion and give both sides notice and an opportunity to supplement the factual record. In *Mack v. South Bay Beer Distributors, Inc.,* 798 F.2d 1279, 1282 (9th Cir.1986), the Ninth Circuit noted that a Rule 12(b)(6) motion did not have to be converted to a summary judgment motion even though the court went beyond the pleadings because the additional evidence considered was of public record and therefore could be judicially noticed. No notice or opportunity to supplement the record had to be given.

■ In the present case, evidence beyond the pleadings has been presented by the defendants and discussed in the briefs. Unless the Court can take judicial notice of these materials, the Court would either have to disregard the evidence, or consider it and convert this motion into a Rule 56(d) motion for summary judgment. If the motion were to be converted, the Court would then, as explained above, have to give notice to the parties and an opportunity to supplement the record.

Because discovery is needed to create a complete factual record, the Court will not treat this motion as a motion for summary judgment. It is therefore necessary for the Court to consider whether the additional facts provided by the defendants can be judicially noticed pursuant to Federal Rule of Evidence 201. *See Institute for Scientific Information, Inc. v. Gordon and Breach, Science Publishers, Inc.,* 931 F.2d 1002, 1011 (3d Cir.1991) (judicial notice on Rule 12(c) motion should be done in accordance with Federal Rule of Evidence 201). Rule 201 states: "A judicially noticed fact must be one not subject to reasonable dispute in that it is ... (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b)(2).

■ Both parties have made reference to parallel proceedings in California. Pursuant to Rule 201(b)(2), the Court can take judicial notice of the contents of court records from another jurisdiction. *Colonial Penn Ins. Co. v. Coil,* 887 F.2d 1236, 1239 (4th Cir.1989); *Green v. Warden, U.S. Penitentiary,* 699 F.2d 364, 369 (7th Cir.), *cert. denied,* 461 U.S. 960, 103 S.Ct. 2436, 77 L.Ed.2d 1321 (1983) ("Furthermore, federal courts may also take notice of proceedings in other courts, both within and outside of the federal judicial system, if the proceedings have a direct relation to matters at issue.") (citations omitted). The contents of the court records that may be judicially noticed include the briefs and petitions of the parties. *See, e.g., United States ex rel. Geisler v. Walters,* 510 F.2d 887, 890 n. 4 (3d Cir.1975) (taking judicial notice of briefs and petitions filed in other courts). These are materials that cannot be reasonably disputed and whose accuracy cannot reasonably be questioned.

■ The defendants also seek to have the Court consider certain Security and Exchange Commission ("SEC") filings that indicate that the defendants have withdrawn specific SEC filings and thus abandoned their proxy solicitation. (Opening Brief of RealCap, Docket Item ["D.I."] 49.) Judicial notice of public filings is also appropriate under Rule 201(b)(2). *See, e.g., Massachusetts v. Westcott,* 431 U.S. 322, 323 n. 2, 97 S.Ct. 1755, 1756 n. 2, 52 L.Ed.2d 349

(1977) ("[R]ecords of the Merchant Vessel Documentation Division of the Coast Guard ... may be judicially noticed."). More specifically, the Second Circuit has recently held that on a Rule 12(c) motion SEC filings can be considered by the Court because judicial notice of such filings is appropriate under Rule 201(b)(2). *Kramer v. Time Warner, Inc.*, 937 F.2d 767 (2d Cir. 1991). This Court reaches a similar conclusion. The defendants have offered other evidence which is not appropriate for judicial notice and will therefore not be considered by the Court on this Rule 12(c) motion. Specifically, the defendants make reference to a letter sent between two of the defendants, offered because it allegedly shows that RealCap has rescinded its agreement with the Pension Fund to orchestrate a proxy contest to take over the two plaintiff limited partnerships. This evidence will not be considered by the Court because it addresses a disputed fact and its accuracy is not beyond question. *See Hinton v. Dept. of Justice*, 844 F.2d 126, 130 n. 1 (3d Cir.1988) (affidavits pertaining to disputed facts are not appropriate for judicial notice). Alleged statements made by nonparties are also not subject to judicial notice for the same reasons.

## II. BACKGROUND

### A. *The Relevant Factual Allegations*

#### 1. The Parties.

The plaintiffs in this action are two real estate limited partnerships and their respective general partners. The plaintiff Southmark Prime Plus, L.P. ("SPP") is a Delaware limited partnership. (Complaint, D.I. 1 at 4.) SPP operates as a real estate holding company that sells shares called units and invests the proceeds in real estate. (D.I. 1 at 4, 8–9). The holders of these units or shares are the limited partners of SPP. (D.I. 1 at 9.) The plaintiff Prime Plus Corporation ("PPC") is a Nevada corporation and the general partner of SPP. (D.I. 1 at 4, 9.) As the general partner of SPP, PPC is responsible for the day to day management of SPP's assets. (D.I. 1 at 9.) In return for these services, PPC receives fees from SPP. (D.I. 1 at 9.) The plaintiff Southmark Equity Partners III, Ltd. ("SEP III") is a California limited partnership which, like SPP, holds a real estate portfolio in which people can invest by becoming limited partners, i.e. unit holders. (D.I. 1 at 4–5, 9.) The plaintiff Southmark Investment Group 86, Inc. ("SIG 86") is a Nevada Corporation and general partner of SEP III. (D.I. 1 at 5, 9.) SIG 86 is paid to manage SEP III's portfolio. (D.I. 1 at 5, 9.) All four of the plaintiffs list their principal place of business as 2711 LBJ Freeway, Dallas, Texas. (D.I. 1 at 4–5.)

Both of the limited partnerships, SPP and SEP III, were organized by Southmark Corporation ("Southmark") or one of its subsidiaries. (D.I. 1 at 8–9.) Southmark is "a real estate and financial services company," that in July of 1989 filed for bankruptcy under Chapter 11 of the U.S. Bankruptcy Code. (D.I. 1 at 9.) While Southmark is not a party to this suit, it did, prior to its bankruptcy, own controlling interests in the two general partners PPC and SIG 86. (D.I. 1 at 8–9.) Apparently, Southmark sold its interests in PPC and SIG 86 in August of 1989 pursuant to a liquidation plan approved by the Bankruptcy Court. (D.I. 1 at 9.)

The purchaser of PPC and SIG 86, and 32 other Southmark partnerships, was McNeil Real Estate Management Inc. ("McNeil Management"), which was organized at about this time by an experienced real estate investor and manager named Robert A. McNeil. (D.I. 1 at 9–10.) McNeil and Southmark intended to seek proxies from the unit holders of SEP III and SPP in an effort to replace SIG 86 and PPC as managing general partners of the plaintiff limited partnerships with a newly created affiliate of McNeil Management. (D.I. 1 at 10.) If the proxy solicitation were successful, a McNeil affiliate would gain control over the day to day management of the limited partnership assets and would presumably receive fees in return. (D.I. 1 at 10.)

#### 2. Previous Litigation.

Prior to the filing of this suit, the defendants filed three separate suits against the plaintiffs. On February 6, 1991 the defen-

dants commenced a suit in the Superior Court of the State of California captioned *Buffalo Laborers' Pension Fund and RealCap Company v. Southmark Equity Partners III, Ltd., et al.*, Case No. BC020830. (D.I. 1 at 13–14.) Two suits were also brought in Texas. (D.I. 1 at 15.) One was brought in Texas state court, *Consolidated Capital Properties I v. Southmark Management Corp., et al.*, No. 91–1578, and the other in a federal Bankruptcy Court, *Capital Properties I, et al. v. Southmark Corp., et al.*, Adversary No. 391–3097. (D.I. 1 at 15.) The defendants instituted the California suit in an effort to obtain a list of the limited partners of SPP and SEP III and to prevent the partnership plaintiffs from using partnership funds to assist McNeil's "election as successor general partner." (D.I. 1 at 14.)

### 3. The Alleged Connections to Organized Crime.

The crux of the plaintiffs' complaint in this action involves the defendant Buffalo Laborers' Pension Fund (the "Pension Fund"), which holds units of both SEP III and SPP and is alleged to have organized crime connections, and its attempt to have a different general partner elected to manage the portfolios and day to day activities of SEP III and SPP. (D.I. 1.) The Pension Fund's nominee was the defendant Quantum Realty Corporation ("Quantum"). (D.I. 1 at 6.) This effort by the Pension Fund and its associates to replace SIG 86 and PPC is alleged by the plaintiffs to violate several provisions of the Securities and Exchange Act of 1934 and the Rules promulgated thereunder, as well as RICO. These allegations will be addressed in greater detail below.

The plaintiffs allege that organized crime controls the defendant Laborers' International Union of North America Local # 210 located in Buffalo, New York ("Local 210"). (D.I. 1 at 5.) ("[Local 210] has been publicly linked by federal authorities to the Buffalo organized crime syndicate."). The plaintiffs further allege that Local 210 and organized crime control the Pension Fund. (D.I. 1 at 3, 8.) Local 210, its officers, and the officers of the Pension Fund are alleged to be controlling persons of the Pension Fund within the meaning of § 20(a) of the Securities and Exchange Act of 1934 ("1934 Act"). (D.I. 1 at 7–8.) Based on innuendo, newspaper articles, and alleged statements by the U.S. Strike Force on Organized Crime (D.I. 1 at 5–6, 20–24), the plaintiffs further assert that three of the Pension Fund Trustees, who are also Local 210 officers, are known organized crime figures. (D.I. 1 at 5–6, 22–24.) These three defendants are Leonard F. Falzone, Salvatore J. Caci, and Daniel J. Sansanese. (D.I. 1 at 5–6.) The plaintiffs have named additional Local 210 officers and Pension Fund Trustees as individual defendants.[3] Lastly, the plaintiffs also allege "that the Pension Fund, its parent union and its officials have been and are the current subjects of state and federal investigations for racketeering and various other criminal offenses." (D.I. 1 at 3.)

According to the Complaint, in 1987 the Pension Fund purchased 3 million units of SEP III at $1.00 per unit and 400,000 units of SPP at $10.00 per unit during the initial public offerings of the two limited partnerships. (D.I. 1 at 10.) The plaintiffs state that these purchases were irregular because they were the first time outside money managers had not selected and made

---

**3.** Listed below is a complete list of the individually named defendants who are either officers of Local 210 or Trustees of the Pension Fund. The office of each individual will be listed and an asterisk will indicate those individuals who are both Local 210 officers and Pension Fund Trustees.

*Local 210:* Leonard F. Falzone (Consultant)*, Salvatore J. Caci (Business Manager)*, Daniel J. Sansanese (Secretary-Treasurer)*, Peter G. Gerace (President)*, Joseph R. Pieri (Business Agent)*.

*Pension Fund:* Leonard F. Falzone (Administrator)*, Salvatore J. Caci (Trustee)*, Daniel J. Sansanese (Trustee, Chairman)*, Peter G. Gerace (Trustee)*, Louis P. Ciminelli (Trustee), Joseph R. Pieri (Trustee)*, William R. Arnold (Trustee), Robert C. Patterson (Trustee). (D.I. 1 at 5–6.)

The Court will refer to Local 210 along with its defendant officers as the "Local 210 defendants" or "Local 210." The Court will refer to the Pension Fund and the defendant Trustees and Administrator as the "Pension Fund Defendants" or the "Pension Fund."

investments for the Pension Fund. (D.I. 1 at 10.) The purchases were also allegedly the first real estate investments ever made by the Pension Fund. (D.I. 1 at 10.) The plaintiffs also attach significance to their allegation that Ronald M. Fino, the then President of Local 210, made the decision to invest in the SPP and SEP III units. (D.I. 1 at 10.) Mr. Fino is allegedly an FBI informant and the son of a Buffalo mob leader. (D.I. 1 at 21.)

According to the plaintiffs' complaint, by purchasing 400,000 SPP units the Pension Fund acquired 7.3% of SPP's outstanding units. (D.I. 1 at 16.) Nonetheless, the Pension Fund did not file a Securities and Exchange Commission ("SEC") Schedule 13D or 13G within the applicable time period allegedly required by § 13(d) of the 1934 Act, 15 U.S.C. § 78m(d), and either SEC Rule 13d–1(a), 17 C.F.R. § 240.13d–1(a) or SEC Rule 13d–1(b), 17 C.F.R. § 240.13d–1(b).[4] (D.I. 1 at 16–17.)

By the fall of 1990, units of SPP and SEP III had plummeted in value. Units of SPP which had been purchased at $10.00 per unit in 1987 were three years later trading at $1.45 per unit on the National Partnership Exchange, Inc. ("NAPEX"). Units of SEP III originally purchased at $1.00 per unit were trading at ten to twenty cents per unit on NAPEX. (D.I. 1 at 10, 13.) As mentioned earlier, by August of 1990, the parent of PPC and SIG 86 (the managing general partners of SPP and SEP III) was liquidating most of its assets pursuant to a Bankruptcy Court order. (D.I. 1 at 9.)

4. The Planned Proxy Contest and Original Securities Filings.

Sometime in May of 1990 the Pension Fund approached the defendant RealCap Company ("RealCap") to see whether it would be interested in spearheading a proxy contest for control of SPP and SEP III. (D.I. 1 at 29.) RealCap is a Texas limited partnership that owns and operates a large number of properties. (D.I. 1 at 7, 29.) On October 22, 1990, approximately the same time Southmark was undergoing bankruptcy proceedings, the Pension Fund entered into an agreement with defendant John A. Doyle, defendant Edward D. Herrick, and RealCap by which the Pension Fund agreed to support an effort by Real-Cap to have one of RealCap's affiliates substituted in for PPC and SIG 86 as managing general partner of SPP and SEP III. (D.I. 1 at 11–12.) Pursuant to this agreement, between November 28, 1990 and November 30, 1990, the Pension Fund transferred to RealCap 5,000 units of SEP III at $1.00 per unit and 500 units of SPP at $10.00 per unit even though both SPP and SEP III units were trading on NAPEX at significantly below those prices. (D.I. 1 at 13, 14, 30.) According to the plaintiffs, these transfers were made so that RealCap or one of its affiliates could participate in a proxy contest for replacement general partner. (D.I. 1 at 14.) Allegedly, RealCap paid the original price of these units so that the Pension Fund could avoid recognizing a loss and in turn avoid possible liability under ERISA. (D.I. 1 at 19–20, 27–28.)

On February 4, 1991 the Pension Fund filed a Schedule 13G with respect to its 1987 purchase of 7.3% of SPP's units.[5] (D.I. 1 at 17.) According to the plaintiffs, this filing was nearly three years late and was materially misleading; at this point the Pension Fund had already agreed to cooperate with RealCap in an effort to gain

---

**4.** Under the Securities and Exchange Act of 1934 and the Rules promulgated thereunder, the acquisition of five percent or more of a registered security triggers a series of reporting requirements. § 13(d) of the 1934 Act, 15 U.S.C. § 78m(d); SEC Rule 13d–1(a), 17 C.F.R. § 240.13d–1(a); SEC Rule 13d–1(b), 17 C.F.R. § 240.13d–1(b). Anyone who obtains five percent or more of a registered security must file either a Schedule 13D or a Schedule 13G. A Schedule 13D must be filed within ten days of a purchase of five percent or more of a registered security and a Schedule 13G within forty-five days. A Schedule 13G disclosure statement can be filed instead of a Schedule 13D if the purchaser of the securities is a pension fund or other eligible entity that holds the securities in the normal course of business without any intention of affecting the control of the issuer. If at any time the Schedule 13G filer decides to affect or influence the control of the issuer, it must then file a Schedule 13D.

**5.** The Schedule 13G was apparently signed on January 31, 1991. (D.I. 1 at 18).

control of SEP III and SPP and therefore, according to the plaintiffs, was not eligible to file a Schedule 13G. (D.I. 1 at 17–18.) The Pension Fund was no longer a passive investor and was therefore required to file a schedule 13D. The Pension Fund also failed to disclose that it had sold 500 units of SPP to RealCap. (D.I. 1 at 18–19.) The plaintiffs further complain that the Pension Fund failed to disclose its organized crime ties on the Schedule 13G it filed. (D.I. 1 at 3, 17–18.)

On the same date the Schedule 13G was filed, however, the Pension Fund and Real-Cap filed a joint Schedule 13D notifying the SEC that the Pension Fund, RealCap and several affiliates of RealCap had, as of October 22, 1990, agreed to jointly attempt to have RealCap or an affiliate [6] made general partner of SPP and SEP III by means of a proxy solicitation.[7] (D.I. 1 .at 18.) According to the plaintiffs, this filing was also late and failed to disclose the defendants' organized crime ties and material information concerning the October 22, 1990 agreement between the defendants.[8] (D.I. 1 at 18–20.)

On February 4, 1991, Herrick, Doyle, Quantum, and Noebel filed Schedule 14Bs concerning their planned proxy solicitation to have Quantum installed as managing general partner of SEP III. (D.I. 1 at 26.) On February 6, 1991, ConCap filed a Schedule 14B with respect to the proxy contest for control over the management of SEP

III. (D.I. 1 at 26.) On March 4, 1991, Herrick, Doyle, Quantum, Nobel and Con-Cap filed Schedule 14Bs for the same purpose with respect to SPP. (D.I. 1 at 26.) On March 12, 1991, the Pension Fund also filed Schedule 14Bs with respect to the proxy solicitation of SPP and SEP III unit holders. (D.I. 1 at 26.) The plaintiffs do not allege that these filings are late, but allege them to be willfully false and misleading in that they do not mention the organized crime ties of the filers and fail to provide other material information.[9] (D.I. 1 at 25–28, 32.) By filing these Schedule 14Bs the defendants allegedly "launched a proxy contest for control of the limited partnerships." (D.I. 1 at 2.)

### 5. The Reported Death of the Planned Proxy Contest.

The plaintiffs do not contend that proxy solicitations were actually mailed. To the contrary, the defendants have withdrawn their proxy solicitation materials from the SEC. (Opening Brief of RealCap, D.I. 49 at Exhibit ["EX"] B.) The plaintiffs have argued before another court that the proxy contest is over, although they now claim this statement only pointed out the defendants' misrepresentations and the defendants remain poised for an effort at control. On July 9, 1991, the RealCap defendants filed an amended Schedule 13D that stated that (1) it may not be deemed part of a "group" under the securities laws; (2) Quantum has requested the SEC to withdraw preliminary proxy materials from

**6.** The Court will refer to the following defendants, all of whom are affiliates of RealCap or officers of RealCap or officers of a RealCap affiliate, collectively as the "RealCap defendants" or "RealCap": RealCap; Quantum Realty Corporation ("Quantum"); ConCap Management Limited Partnership ("ConCap"); John A. Doyle (President, Chief Operating Officer, Director and shareholder of Quantum, President and managing general partner of RealCap); Edward D. Herrick (Vice President and Treasurer of Quantum, partner in RealCap, Vice President and share holder of ConCap); Terry L. Noebel (employee of RealCap and ConCap). (D.I. 1 at 6–7.)

**7.** According to the Complaint, Quantum was organized under Delaware law by the defendants sometime in early 1991 with the intention

that it become the replacement managing general partner of SPP and SEP III. (D.I. 1 at 6.)

**8.** Specifically, the plaintiffs object that RealCap and the Pension Fund apparently failed to: (1) state the number of units of SPP purchased by RealCap from the Pension Fund, (2) indicate that RealCap paid the Pension Fund the same amount the Pension Fund had paid for the SPP units even though they were trading at significantly below that price, (3) explain why the parties agreed to this higher price, and (4) describe their long term plans for SPP and SEP III. (D.I. 1 at 19–20, 28.)

**9.** The disclosures alleged to be lacking are those that the plaintiffs allege to be lacking in the Schedule 13Ds filed, see supra note 8, and how these factors will affect the threatened proxy contest.

consideration on March 21, 1991; (3) neither RealCap nor its affiliates plan a change in control of the management of SPP or any related partnership; (4) no contractual or other relationship relating to the exercise of control over SPP units exists between RealCap and the Pension Fund; and (5) RealCap and the Pension Fund have not yet reached a termination agreement with respect to the agreement of October 22, 1990. Amendments to the original Schedule 14B were also made. The plaintiffs then filed a motion for leave to file a supplemental complaint.

The proposed supplemental complaint charges the defendants with further violations of § 13(d) and RICO for the failure to give an accurate report of the status of the agreement between the parties, details of negotiations, and the failure to report this lawsuit. The plaintiffs also claim that the Local 210 defendants have violated § 13(d) by failing to file amended Schedule 13Ds disclosing these same facts. (Proposed Supp. Complaint, D.I. 72 at EX A, pp. 9–12.) Finally, the plaintiffs claim that these allegedly faulty securities filings constitute additional predicate acts under RICO. (D.I. 72 at EX A, pp. 12–13.)

### 6. Damages.

The plaintiffs have made few specific allegations concerning damages. The pollution of the electoral process and the false or misleading information provided to unitholders is the most concrete, and the Court will address these allegations. (D.I. 1 at 29, 39.) The statements about the dire financial consequences of a change of management from the allegedly threatened proxy contest, (D.I. 1 at 36), are purely speculative. At one point in the complaint the plaintiffs intimate that the above alleged conduct has interfered with McNeil's intended proxy contest to insert his affiliates as general managing partners of SPP and SEP III. (D.I. 1 at 10.) McNeil, however, is not a party to this suit. Another allegation of damage made by the plaintiffs is their repeated assertion that "[a]s a direct result of the acts and conduct of defendants, plaintiffs have been injured in their business and property." (D.I. 1 at 37–38.)

### B. *The Alleged Violations of the Defendants*

According to the plaintiffs, the above facts reveal several violations of the law for which the defendants are liable to the plaintiffs. The alleged violations are as follows.

1. The Pension Fund, Local 210 and RealCap violated § 13(d) of the 1934 Act by: (a) failing to give timely disclosure of the Pension Fund's purchase of more than 5% (i.e. 7.3%) of SPP's outstanding units; [10] (b) failing to give timely disclosure of the existence of the October 22, 1990 agreement between the defendants by which they agreed to cooperate in an effort to seize control of SPP and SEP III; (c) failing to provide additional information concerning the specifics of the October 22 agreement, *see supra* note 8; and (d) failing to disclose the defendants' ties to organized crime.[11] In the proposed supplemental complaint the plaintiffs claim that RealCap further violated § 13(d) by: (e) falsely representing that

---

**10.** The Court assumes that the § 13(d) claims are only being raised by SPP and PPC. Ownership of 5% or more of the outstanding shares of a registered security triggers the disclosure requirements of § 13(d). While the plaintiffs have alleged that the Pension Fund purchased 5% or more of SPP's shares, no such allegation has been made with respect to SEP III. Since no disclosures were required with respect to SEP III by the defendants under § 13(d), no violations could have occurred with respect to SEP III.

**11.** The plaintiffs contend that under § 13(d) the defendants were required to include all of the above information in their Schedule 13Ds and 13Gs that were filed on February 4, 1991. The allegation is that the disclosures described in (a) and (b), though made, were made late. On the other hand, the disclosures described in (c) and (d) were never made. Some of the Schedule 13D and 13G omissions therefore have been partially remedied while others have not. The Court also notes that RealCap's involvement in the non-disclosures must have begun between May of 1990 when the defendants began negotiating an agreement and October 22, 1991 when the agreement was finally reached. The Pension Fund's and Local 210's violations thus date back to 1987, while RealCap's violations only date back to May or October of 1990.

RealCap had terminated the October 1990 agreement unilaterally, since the agreement did not allow this. They also charge the RealCap defendants and the Local 210 defendants with violations of § 13(d) for the following: (f) failing to report the withdrawal of proxy materials in a timely fashion; (g) failing to report material facts about this litigation; and (h) failing to report material facts about the purported termination agreement and the current relations between the defendants.

2. The Pension Fund, Local 210 and RealCap are alleged to have violated § 14(a) of the 1934 Act by: (a) failing to disclose the existence of the October 22, 1990 agreement; (b) failing to disclose material information concerning the October 22, 1990 agreement on the Schedule 14B, *see supra* note 8; and (c) failing to disclose their ties to organized crime on the Schedule 14B.[12]

3. According to the plaintiffs, the above described tardy and incomplete SEC filings, along with the assignment of units from the Pension Fund to RealCap, resulted in no less than twenty violations of the wire and mail fraud statutes, 18 U.S.C. §§ 1341 and 1343. (D.I. 1 at 32–35.)

4. The plaintiffs also contend in the Complaint and the proposed supplemental complaint that the defendants were an enterprise that engaged in a pattern of racketeering activity causing injury to business or property in violation of RICO. Specifically, the plaintiffs contend: (a) that the defendants, through a pattern of racketeering, have acquired an interest in and are attempting to control an enterprise engaged in or affecting interstate commerce in violation of 18 U.S.C. § 1962(b); (b) that the defendants conducted the affairs of an enterprise affecting or engaging in interstate commerce by means of a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c); and (c) that in violation of 18 U.S.C. § 1962(d), the defendants conspired to violate both 18 U.S.C. §§ 1962(b)

and (c). (Proposed Supp.Comp., D.I. 49 at EX B.)

### C. *The Remedies Sought by the Plaintiffs*

Due to the above alleged violations, the plaintiffs believe they are entitled to the following relief: (1) that the defendants be permanently enjoined from acquiring additional units of SPP and SEP III; (2) that the defendants be permanently enjoined from soliciting proxies from unit holders of SPP and SEP III; (3) that the defendants be permanently enjoined from voting their units of SPP and SEP III; (4) that the defendants be permanently enjoined from using their units in an attempt to control or affect the management of SPP or SEP III; (5) that the defendants be permanently enjoined from making any false statements in an effort to control or affect management of SPP or SEP III; (6) that the Court declare that the defendants have violated §§ 13(d) and 14(a) of the 1934 Act; (7) that the Court order the defendants to divest themselves of their units of SPP and SEP III; (8) that the Court order the defendants to file and disseminate corrected Schedule 13Ds and Schedule 14Bs before they take further action to influence the management of SPP or SEP III; (9) that the Court award the plaintiffs treble damages pursuant to RICO; (10) that the Court award the plaintiffs their costs and attorneys fees; and (11) that the Court award any other relief it deems "just and proper." (D.I. 1 at 39–40.) The plaintiffs have stated at oral argument they do not seek damages from an implied cause of action as a result of the alleged violations of §§ 13(d) and 14(a) of the 1934 Act. (D.I. 82 at 29–31, 37.) The Court will therefore only address the claim for equitable relief under these provisions.

### D. *Jurisdiction and Venue*

Jurisdiction and Venue in this Court are proper. (Memorandum Opinion and Order

---

**12.** In this claim and claim 2(b) above the plaintiffs contend that RealCap is liable for omissions concerning the alleged organized crime connections of Local 210 and the Pension Fund because RealCap should have known about those connections. The plaintiffs reach this conclusion because, they argue, newspaper publicity made it common knowledge that the Pension Fund and Local 210 were linked to organized crime.

of Senior Judge James L. Latchum dated June 20, 1991, D.I. 55 & 56).

## III. DISCUSSION

### A. *The Application of Judicial Estoppel*

One of the contested facts in this case is how the Court should regard the proxy contest, and the resolution of this question involves legal issues. In an attempt to dismiss a previous action brought against them in California, the plaintiffs argued that the proxy contest is "most indisputably" over because of the withdrawal of the proxy statements and "[t]here is no longer any battle for SEP III and SPP." (Opening Brief of RealCap, D.I. 49 at EX A, pp. 1–2.) The defendants have argued that this statement prevents the plaintiffs from contending the proxy contest is not over and that this statement makes the case moot.

In the Third Circuit, federal courts have estopped parties from asserting contradictory positions in order to protect the integrity of the courts. *See Scarano v. Central R.R. Co.*, 203 F.2d 510 (1953). The plaintiffs claim that their statement in the California litigation was premised solely on RealCap's pleadings in this action. A fair reading of the plaintiffs statements, however, shows that their statement was not contextual but purported to convey, in their words, "the reality of the situation" about the lawsuit. (Opening Brief of RealCap, D.I. 49 at EX A, p. 2.)

A party cannot change a characterization of the facts in a case in order to later gain an advantage, *United States v. Kepner*, 843 F.2d 755, 760 (3d Cir.1988), and the contradictory positions of the plaintiffs in this instance are to their advantage in both cases. The principle of judicial estoppel still applies where the conflicting statements are made in a different fora.[13] *See Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414 (3d Cir.), *cert.*

*denied*, 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988) (applying judicial estoppel to a debtor's suit due to its actions in previous bankruptcy litigation). The plaintiffs are therefore estopped from claiming that the proxy contest was not "indisputably over" at that time.

The plaintiffs, however, point out that since that time the defendants still have not divested themselves of stock, taken the measures the plaintiffs think necessary to dissolve the vestiges of their group, or made the disclosures the plaintiffs have requested. It is not reasonable, however, to presume that a proxy contest is imminent merely because a group of investors continue to hold a block of shares and are reluctant to publicize alleged connections to organized crime. The proxy contest is over. Nevertheless, the legal issues in the two lawsuits are not the same, and the characterization of the former lawsuit as moot may not apply to this one. *See Miller Tabak Hirsch & Co. v. Penn Traffic Co.*, 643 F.Supp. 1297, 1301 (W.D.Pa.1986) (judicial estoppel not applicable to separate legal issues).

### B. *The Plaintiffs' Request for Equitable Relief Under the Securities Laws*

#### 1. Mootness.

##### a. *The § 14(a) Claims.*

Section 14(a) of the 1934 Act, 15 U.S.C. § 78n(a), regulates proxy solicitations for registered securities. Through SEC rules and schedules, § 14(a) imposes several specific disclosure requirements on persons soliciting proxies. These disclosure requirements would be applicable to the defendants' solicitation of proxies from both SPP and SEP III. The Supreme Court has specifically addressed the legislative intent behind this provision. "The purpose of § 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or

---

**13.** *Scarano*, 203 F.2d 510, is not to the contrary. Because of the narrowness of the question presented, the court neither rejected nor adopted the traditional rule that "a party to litigation will not be permitted to assume inconsistent or mutually contradictory positions with respect to the same matter in the same or a successive series of suits." *Id.* at 513 (citation omitted).

inadequate disclosure in proxy solicitation." *J.I. Case Co. v. Borak*, 377 U.S. 426, 431, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964). The goal, ultimately, was "fair corporate suffrage." *Id.*

█ In light of the statute's purpose and its application to proxy contests, injunctive relief to correct any of the mistakes alleged to be made pursuant to § 14(a) appears to be moot now that the plaintiffs have withdrawn from the proxy contest. The defendants do not presently pose a significant threat to the plaintiffs; neither a tender offer nor a proxy solicitation is ongoing. Because the defendants are not currently soliciting proxies and have abandoned their effort, they are not subject to § 14(a). *See CNW Corp. v. Japonica Partners, L.P.*, 776 F.Supp. 864, 868 (D.Del.1990); *Koppel v. Wien*, 575 F.Supp. 960, 966–67 (S.D.N.Y.1983), *rev'd in part on other grounds*, 743 F.2d 129 (2d Cir.1984). In order to avoid mootness, there must be a reasonable expectation of recurrence or there must be harm from the alleged violation. *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979). In the case of the § 14(a) claims, neither of these elements exist.

It is true that the defendants bear a heavy burden in arguing that the proxy contest is over and that there is no reason to expect it to continue. *See United States v. W.T. Grant*, 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). The plaintiffs prior statement that the contest was "most indisputably over," however, allows the defendants to meet that burden on this particular factual issue. Mere suspicions about the defendants' intentions are not sufficient to revive the characterization of an active proxy contest. *See Thompson v. United States Dep't of Labor*, 813 F.2d 48, 51 (3d Cir.1987).

There is no basis for corrective disclosure or other relief based on § 14(a). The plan to solicit proxies has been abandoned before it even began, and therefore possible omissions or false statements about the proxies do not affect the public record. In

addition to an injunction serving no useful purpose, there is no basis for declaratory relief. *See CNW Corp. v. Japonica Partners, L.P.*, 776 F.Supp. 864, 868 (D.Del. 1990). The § 14(a) claims are moot.

#### b. The § 13(d) Claims.

Section 13(d) of the 1934 Act, 15 U.S.C. § 78m(d), was added to the statute in 1968 by the Williams Act. Under § 13(d) any person who acquires 5% or more of the outstanding shares of a registered security must satisfy specific disclosure requirements. These disclosures must be made to the issuer, each exchange where the securities are traded, and the SEC. Clearly, no claim can be made by SEP III or its general partner SIG 86 under § 13(d) because the defendants never attained, nor attempted to attain, a 5% or more interest in the outstanding units of SEP III. The discussion of § 13(d) is therefore limited to claims brought by SPP and its general partner PPC.

Section 13(d), and the Williams Act generally, were enacted by Congress in response to growing concern over the increased use of tender offers in contests for corporate control. *Piper v. Chris–Craft Indus., Inc.*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977); *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975). The legislative intent behind the Williams Act and § 13(d) has been thoroughly addressed by the Supreme Court. In *Rondeau*, a § 13(d) case, the Supreme Court noted:

> The purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party.

*Rondeau*, 422 U.S. at 58, 95 S.Ct. at 2075–76. Despite this apparently single-minded concern with protecting investors, Congress remained mindful of the need to ensure that the Williams Act did not get used as a tool with which management could frustrate legitimate tender offers. *Piper*

*v. Chris–Craft Indus.*, 430 U.S. 1, 24–30, 97 S.Ct. 926, 940–44, 51 L.Ed.2d 124 (1976); *Rondeau*, 422 U.S. at 58–59, 95 S.Ct. at 2075–76.

On the basis of this legislative purpose and various cases, the defendants argue that the § 13(d) claims are moot. The RealCap defendants rely on their amended Schedule 13D statement to show that no group for the purposes of the 1934 Act exists, and all of the defendants rely on the fact that the defendants are not now engaged in a proxy contest. Some of the defendants also argue that the action is moot because the alleged omissions and false statements still remaining are immaterial as a matter of law, which will be addressed below.

The Court cannot conclude at this stage that the existence of the group is not at issue. The plaintiffs argue that a group still exists on the basis of the defendant's failure to reach a termination agreement and the continued existence of the group's vehicles for the purposes of acquisition. These facts, which the Court must accept as true, and the factual dispute about the current status of the group do not allow the Court to accept the defendants' assertions at this time.

■ The presence of the proxy contest or even a threatened battle for control is not necessary to pursue an action pursuant to § 13(d). By its own terms the rule applies the requirement for disclosure not where there is a contest for control, but where persons acquire a certain percentage of stock to comply with its terms. *See* 15 U.S.C. § 78m(d)(1). One section confirms this application of the disclosure rules to periods without a proxy contest; it requires additional disclosure *"if* the purpose of the purchases or prospective purchases is to acquire control." 15 U.S.C. § 78m(d)(1)(C) (emphasis added).

Neither the rule's purpose nor precedent limit its application. Although Congress intended the provision to help prevent abuses in corporate control, it may be seen as a prophylactic rule that helps investors to monitor those who come to control large blocks of stock that might represent the potential for a change in control in the future. *See GAF Corp. v. Milstein*, 453 F.2d 709, 717 (2d Cir.1971), *cert. denied*, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972). Its application is therefore wider than in the context of a threatened proxy battle. Although the Supreme Court left the question open in *Rondeau*, 422 U.S. at 59 n. 9, 95 S.Ct. at 2076 n. 9, many courts have been explicit in their reasoning in concluding that "§ 13(d) is not tied to proxy contests." *Sisak v. Wings and Wheels Express, Inc.*, [1971 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 92,991 at 90,-668, 1970 WL 223 (S.D.N.Y.1970); *see also Dan River, Inc. v. Unitex Ltd.*, 624 F.2d 1216, 1222 n. 5 (4th Cir.1980) ("the target corporation has a right to injunctive relief prior to compliance").

### 2. Issuer Standing.

■ Contrary to some of the defendants' contentions, an issuer has standing to seek injunctive relief under § 13(d). *See, e.g., Energy Ventures, Inc. v. Appalachian Co.*, 587 F.Supp. 734 (D.Del.1984). Although the Supreme Court's recent holding in *Virginia Bankshares v. Sandberg*, —— U.S. ——, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991), limits the standing of minority shareholders seeking damages under § 14(a), its reasoning cannot be stretched so far as to prospectively overrule issuer standing for injunctive relief under § 13(d). Actions for injunctive relief have been regarded differently than implied actions for damages under the 1934 Act and, as previously discussed, § 13(d) implicates a slightly different method of monitoring corporate control than § 14(a).

Furthermore, even if the reasoning of *Virginia Bankshares* did extend that far, the Court would be restrained from finding no standing. The Supreme Court allowed issuer standing for injunctive relief in a § 13(d) action in *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975). The Supreme Court has cautioned the lower courts that "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower court] should follow the

case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriquez de Quijas v. Shearson/American Express,* 490 U.S. 477, 484, 109 S.Ct. 1917, 1921–22, 104 L.Ed.2d 526 (1989).

### 3. Materiality.

 In order for this Court to give relief, the alleged continuing violations must be material. Some of the alleged violations of § 13(d) have now been remedied by the amended Schedule 13D. The only continuing violations of § 13(d) alleged by the plaintiffs in the Complaint are the defendants' failure to provide specific details concerning their October 22, 1990 agreement, *see supra* note 8, and their failure to disclose their alleged ties to organized crime. If neither of these is material, the omissions and material statements alleged in the Complaint have been corrected and the request for injunctive relief under § 13(d) has become moot. *See Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975).

 In the context of § 13(d), the materiality of a fact can be determined by whether a reasonable shareholder would consider it important in "assess[ing] the potential for changes in corporate control and adequately evaluat[ing] the company's worth." *GAF Corp. v. Milstein,* 453 F.2d 709, 717 (2d Cir.1971) (citation omitted). At this stage the Court can only find the fact immaterial if the omissions or false statements are so unimportant that reasonable minds could not differ about the issue. *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); *Craftmatic Securities Litig. v. Kraftsow,* 890 F.2d 628, 641 (3d Cir.1989). The issue of materiality is thus ill-suited to summary disposition. *See TSC,* 426 U.S. at 450, 96 S.Ct. at 2132.

Bearing this standard in mind, the Court will determine if the alleged omissions may be disposed of because they are immaterial as a matter of law. The plaintiffs charge that the securities filings omit certain facts about some of the defendants' criminal backgrounds, including an indictment of an officer of the Pension Fund for racketeer-

ing and loan-sharking. In the past some courts have found investigations of uncharged crimes and other incriminating facts to be material disclosures. *See, e.g., Ballan v. Wilfred American Educational Corp.,* 720 F.Supp. 241 (E.D.N.Y.1989). At this stage of the proceeding, the Court cannot say that none of the alleged facts about some of the defendants' backgrounds could not be adduced by a rational trier of fact to involve material facts.

Similarly, the plaintiffs have alleged facts about the agreement between the Pension Fund and RealCap that, taken as true, could be deemed material. RealCap's amended 13D proclaims that RealCap has unilaterally terminated the agreement but that the parties have not concluded a termination agreement. (Reply Brief of RealCap, D.I. 49 at EX B.) On the basis of the defendants' failure to reach a valid agreement terminating the relation between the defendants and dissolving the vestiges of their undertaking, the plaintiffs claim that an agreement still exists. Under the statute, the defendants must disclose the details of an agreement, an arrangement or an understanding that exists. 15 U.S.C. § 78m(d)(1)(E). At this point the Court cannot conclude that no reasonable trier of fact would not conclude that the filings in question meet that standard.

### 4. The Possibility of Equitable Relief.

 In *Rondeau* the Supreme Court held that "questions of ... relief ... in private actions under the securities laws ... [are] to be determined according to traditional principles." 422 U.S. at 64, 95 S.Ct. at 2079. In order for the plaintiffs to succeed in their efforts to obtain equitable relief, they will have to meet all of the requirements traditionally required for such relief. *Id.* at 57–65, 95 S.Ct. at 2075–79. Traditionally, a party seeking injunctive relief must show that: (1) it will suffer irreparable harm absent the relief, and (2) legal remedies are inadequate. *Id.* at 57, 95 S.Ct. at 2075. The Court should also consider: "(3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Energy Ventures, Inc. v. Appa-*

*lachian Co.,* 587 F.Supp. 734, 739 (D.Del. 1984); *see also Rondeau,* 422 U.S. 49, 95 S.Ct. 2069.

The defendants contend that because the plaintiffs have not specified any financial damages and the threatened proxy contest has been abandoned, no irreparable harm exists that could justify equitable relief. The continuation of material non-disclosures, however, can constitute irreparable harm. *General Aircraft Corp. v. Lampert,* 556 F.2d 90, 96–97 (1st Cir.1977); *Kaufman and Broad, Inc. v. Belzberg,* 522 F.Supp. 35, 46 (S.D.N.Y.1981). At this point in the litigation the Court cannot conclude that the plaintiffs are not entitled to any injunctive relief.

5. The Pleading of the Cause of Action Against the Local 210 Defendants.

■■■ The Local 210 defendants may not escape the plaintiffs' § 13(d) claim merely because their organization does not own any units in the limited partnerships. The Local 210 defendants could conceivably hold secondary liability under § 20 of the 1934 Act as controlling persons of the Pension Fund. *See* 15 U.S.C. § 78t. The Complaint states that the Local 210 defendants had a controlling influence over the Pension Fund through their institutional connections and is sufficient to allege secondary liability under § 20(a). *See Harriman v. E.I. DuPont DeNemours and Co.,* 372 F.Supp. 101, 104–05 (D.Del.1974).

6. The Pleading of the Cause of Action Against the RealCap Defendants.

The RealCap defendants argue that the Complaint fails to state a cause of action against them with regard to the allegation concerning other defendants for failing to state that the RealCap defendants knew or should have known of their acts. The plaintiffs need not plead the exact legal standard in the Complaint. Here the Fed-

eral Rules of Civil Procedure only require "a short and plain statement of the claim" that gives the defendant notice of the claim and its basis. *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957) (quoting Rule 8(a)(2)). The Complaint adequately satisfies these criteria in this case.

C. *The Plaintiffs' RICO Claims*

The plaintiffs' RICO claims are brought pursuant to 18 U.S.C. §§ 1962(b), (c) and (d). Essentially the plaintiffs allege that: (a) the defendants, through a pattern of racketeering, have acquired an interest in and are attempting to control an enterprise engaged in or affecting interstate commerce in violation of § 1962(b); (b) the defendants conducted the affairs of an enterprise affecting or engaging in interstate commerce by means of a pattern of racketeering in violation of § 1962(c); and (c) in violation of § 1962(d), the defendants conspired to violate both § 1962(b) and § 1962(c).

Claims under §§ 1962(b) and (c) require a party seeking relief to establish a "pattern of racketeering activity." [14] *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Additionally, "[i]n order to state a claim under RICO subsection 1962(d), a plaintiff must allege (1) agreement to commit the predicate acts of fraud, and (2) knowledge that those acts were part of a pattern of racketeering activity conducted in such a way as to violate section 1962(a), (b), or (c)." *Rose v. Bartle,* 871 F.2d 331, 366 (3d Cir.1989) (citations, quotes, and punctuation omitted). Like §§ 1962(b) and (c), § 1962(d) only imposes liability where there is a pattern of racketeering activity or a pattern of racketeering activity was intended because a person cannot knowingly engage in a pattern of racketeering activity if the conduct engaged in does not

---

**14.** 18 U.S.C. §§ 1962(b) and (c) read:

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

constitute such a pattern. *See Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 792 n. 8 (3d Cir.1984), *cert. denied*, 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985); *J.A. Moore Constr. Co. v. Sussex Assoc., L.P.*, 688 F.Supp. 982, 996 (D.Del.1988) ("[A] RICO conspiracy must contain an agreement to employ a pattern of racketeering activity. . . ."). Therefore, in order for the plaintiffs to establish any of their RICO claims they will have to show that the defendants engaged in a pattern of racketeering activity.

### 1. Establishing a Pattern of Racketeering.

Section 1961(5) defines "pattern of racketeering activity" as

> at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity.

18 U.S.C. § 1961(5). This definition, the Supreme Court has pointed out, is not very informative because " 'while two acts are necessary, they may not be sufficient.' " *H.J. Inc.*, 492 U.S. at 237, 109 S.Ct. at 2899 (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985)). In an effort to answer some of the questions left open by the statute concerning what is meant by "pattern of racketeering activity," the Supreme Court developed its "related and continuous" test. *H.J. Inc.*, 492 U.S. at 239, 109 S.Ct. at 2900 ("to prove a pattern of racketeering activity a plaintiff . . . must show that the racketeering predicates are related *and* that they amount to or pose a threat

of continued criminal activity."). For present purposes the Court is primarily concerned with the continuity requirement.

### a. The Continuity Requirement.

■ The Supreme Court's opinion in *H.J. Inc.* suggests that a determination of whether predicate acts satisfy the continuity requirement of RICO is based on a two step analysis. First, are the predicate acts open-ended or closed-ended? Second, if the predicate acts are open-ended, do they indicate a threat of long-term, or continued criminal activity; and if the predicate acts are closed-ended, what was, or will be, their duration? [15] As the Third Circuit has noted, after *H.J. Inc.* "duration is the *sine qua non* of continuity." *Hindes v. Castle*, 937 F.2d 868, 873 (3d Cir.1991).

### i. Closed–Ended or Open–Ended.

■ Predicate acts are open-ended where, by their very nature, they "project[ ] into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241, 109 S.Ct. at 2902. In *H.J. Inc.* the Supreme Court gave the example of a hoodlum that extorts "protection money" from several store owners and tells them that he will come back each month to collect his "premiums." 492 U.S. at 242, 109 S.Ct. at 2902. Another example given by the Supreme Court is the situation where the predicates are an "ongoing entity's regular way of doing business." *Id.* On the other hand, predicate acts are closed-ended when they do not project into the future or threaten repeated conduct. *Id.* at 241, 109 S.Ct. at 2901. Put differently, the closed-ended "concept refer[s] . . . to a closed period of repeated conduct." *Id.* An example is when the predicate acts pertain to the at-

---

**15.** In *H.J. Inc.* the Supreme Court described its analysis as follows:

> [The continuity requirement] is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. It is, in either case, centrally a temporal concept, and particularly so in the RICO context.
>
> \* \* \* \* \* \*
>
> A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending

over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated.

492 U.S. at 241–42, 109 S.Ct. at 2901–02 (citations omitted).

tainment of a single clearly delineated goal. The predicate acts alleged in the present action are closed-ended. Each of them pertains solely to the defendants' now aborted attempt to gain managerial control over SPP and SEP III. *See, e.g., Hindes,* 937 F.2d at 874 ("However, in this case because the fraudulent solicitation of contributions ended with the election of Wolf in November 1988, and the alleged purpose of the scheme was achieved with the election of Wolf, the district court properly determined that there existed no threat of continuing racketeering activity."); *Banks v. Wolk,* 918 F.2d 418 (3d Cir.1990) (no threat of repetition where defendants only participated in one completed real estate fraud and there was no indication that they would participate in others); *Marshall–Silver Constr. Co., Inc. v. Mendel,* 894 F.2d 593 (3d Cir.1990) (no threat of repetition where defendant engaged in a single scheme to bankrupt plaintiff).

The plaintiffs nonetheless argue that the defendants are engaged in an ongoing scheme that projects into the future—a contention that is unsupported by the allegations of the Complaint. The predicate acts themselves do not suggest that there is a threat of repetition, and the plaintiffs' broad unsupported allegations that there will be other victims cannot convert the defendants' predicate acts into conduct that projects into the future.[16] The only allegations concerning the purported threat of repeated conduct are extremely vague. The plaintiffs simply allege that the defendants plan to seize control of "other public limited partnerships."[17] This allegation is appended, haphazardly, to selected paragraphs of the complaint. (*Compare* D.I. 1 at ¶¶ 103, 106, 114 & 117 *with* ¶¶ 2, 45, 48, 50, 51 111 & 118.) The plaintiffs' allegations of threatened future fraudulent conduct are insufficient whether they are measured by Rule 9(b) or Rule 8 of the Federal Rules of Civil Procedure.

The plaintiffs have described a scheme by which the defendants are alleged to have sought managerial control of SPP and SEP III by fraudulent means. These allegations are relatively clear. However, the plaintiffs' further allegation that the defendants seek to gain control of several other unspecified partnerships is inadequately pled under both Rule 9(b) and Rule 8.

In RICO cases fraud must be pled pursuant to Federal Rule of Civil Procedure 9(b). *Seville,* 742 F.2d at 791; *Berk v. Ascott Inv. Corp.,* 759 F.Supp. 245, 254–55 (E.D.Pa.1991); *Klapper v. Commonwealth Realty Trust,* 657 F.Supp. 948, 959 (D.Del. 1987). This does not mean that a party must plead the "date, place or time" of fraud. Rather, as the Court in *Berk* noted: "The question ... therefore, is whether the plaintiffs have injected precision and some measure of substantiation into their complaint sufficient to allow defendants to prepare an adequate answer to the allegations." *Berk,* 759 F.Supp. at 254. In the present case, where the existence of a "pattern of racketeering activity" depends in large part upon whether certain conduct is ongoing or threatens repetition, the plaintiffs' failure to name the "other" limited partnerships or any acts taken against them deprives the defendants of an opportunity to respond to the allegation and show that there is no continuing threat. Rule 9(b) is also intended to "safeguard against spurious allegations." *Klapper,* 657 F.Supp. at 959. This purpose would be frustrated if the Court were to allow plaintiffs in RICO cases to allege "additional

---

**16.** The alleged involvement of organized crime does not alter the Court's analysis. As the plaintiffs have persuasively argued in another section of their briefs, the plaintiffs hold the defendants accountable for their conduct under the 1934 Act and not their status. The Supreme Court has rejected the narrowing of RICO to defendants connected with organized crime. *H.J. Inc.* at 236–37, 109 S.Ct. at 2898–99. The statute's terms similarly cannot be broadened on this basis. Congress intended RICO to attack ongoing criminal enterprises. The allegations of or-

ganized crime in the air do not establish the continuity necessary for a RICO claim. *Cf. Palsgraff v. Long Island R.R.,* 248 N.Y. 339, 162 N.E. 99 (1928).

**17.** *See e.g.,* D.I. 1 at ¶ 106:
 Sometime in or about May, 1990, defendants entered into a conspiracy, scheme, and plan unlawfully to acquire and maintain an interest in and control of legitimate enterprises, including SEP III, SPP, and other public limited partnerships....

unknown future victims" and thus circumvent the statute's requirement that RICO violations be "continuous."[18] The Court therefore will not consider the plaintiffs' allegation that there is a threat of future criminal conduct by the defendants. The illegal conduct alleged by the plaintiffs is closed-ended.

### ii. *Duration.*

Conduct that is "closed-ended" can still be "continuous" for RICO purposes if the conduct spans a sufficiently long period of time. *H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. at 2902. The Supreme Court's only guidance as to how long is long enough was its statement in *H.J. Inc.* that

> [a] party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening not future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct.

*Id.* at 242, 109 S.Ct. at 2902. The following subsequent case law has provided additional guidance. *Hughes v. Consol–Pennsylvania Coal Co.*, 945 F.2d 594, 611 (3d Cir. 1991) ("twelve months is not a substantial period of time"); *Hindes*, 937 F.2d at 873–75 (conduct extending over eight months where there is no threat of repetition is not continuous); *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1417–18 (3d Cir. 1991), *cert. denied*, — U.S. ——, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991) (predicate acts of fraud extending over eight months

not continuous where there was no threat of repeated criminal conduct); *Marshall–Silver*, 894 F.2d at 597–98 (predicate acts that extended for a period of less than seven months were not continuous where there was no threat of repeated criminal conduct); *Banks*, 918 F.2d at 418 (period of eight months is not continuous).[19]

In the present action the Court has already concluded that the alleged predicates are closed-ended, i.e. they do not by their nature project into the future. The next question is whether the alleged predicates extend over a "substantial period of time" and thus suggest "long-term criminal conduct." The predicate acts alleged by the plaintiffs begin, at the earliest, in May of 1990 when the defendants allegedly agreed to jointly pursue a proxy contest for control of SPP and SEP III and did not file already overdue Schedule 13Ds. The last predicate acts occurred sometime before March of 1991 when RealCap requested by letter that the SEC withdraw its proxy materials. (D.I. 49 at EX B; D.I. 62 at EX A.) Any omissions or misstatements made after that date cannot be said to have been predicates done in furtherance of the RICO enterprise's objectives. This ten month period of activity by the defendants does not constitute continuous criminal conduct. The plaintiffs have failed to adequately allege a "pattern of racketeering activity." As a consequence, the plaintiffs' RICO claims will be dismissed in their entirety.

### D. *Plaintiffs' Motion for Leave to File a Supplemental Complaint*

All four plaintiffs seek leave of the Court to file a supplemental complaint alleging

---

**18.** Even under Rule 8, which requires nothing more than notice pleading, the Court concludes that the plaintiffs' vague allegation that other unspecified and unknown limited partnerships will be harmed in the future by the defendants does not give the defendants an opportunity to respond in a meaningful way.

**19.** *Swistock v. Jones*, 884 F.2d 755 (3d Cir.1989) is not to the contrary. Writing for the Court in *Swistock*, Chief Judge Sloviter noted that "the existence of a [14 month] closed-end period of repeated conduct" may be sufficient to satisfy the requirements of *H.J. Inc. Swistock*, 884 F.2d at 759. The Court, however, noted that the defendants' scheme included both fraud in the

sale of real estate and fraud related to leases that extended indefinitely into the future. *Id.* This threat of continued conduct posed by the defendants in *Swistock* was important to the Court of Appeals' decision to reverse the district court's dismissal of the RICO action. As noted in another opinion written by Chief Judge Sloviter: "We said that these further allegations [in *Swistock*] were sufficient to raise the issue of whether fraud was the defendant's regular way of doing business" and thus whether the defendants threatened continued criminal activity. *Hindes*, at 873. In any event, the predicate acts in this case extended over 10 months not 14 months.

further omissions and misstatements in the defendants' Schedule 13Ds. The Court will deny this motion at this time. The proposed supplemental complaint does not affect the Court's analysis of the RICO claims and therefore provides no reason for allowing supplementation. *See J.E. Mamiye & Sons, Inc. v. Fidelity Bank,* 813 F.2d 610, 613 (3d Cir.1987). The alleged failure of the defendants to disclose the precise status of the termination agreement, the precise relation between the defendants, and this litigation are outgrowths of the inadequacy of original securities filings and the controversy that surrounds it. All of the surviving allegations of the defendants' securities violations relate to their failure to adequately disclose the information called for on a Schedule 13D. They do not demonstrate a new effort to seize control of the limited partnerships and do not extend the period of continuity.

The Court will not provide a leave to file the proposed supplemental complaint, but will allow the introduction of the facts stated therein under the surviving § 13(d) claims. The proposed supplemental complaint calls for the same relief as in the Complaint. (*Compare* D.I. 1 at 39–40 *with* D.I. 49 at EX A, pp. 6–7.) The proposed supplemental complaint also claims that the failure to disclose the existence of this litigation and the negotiation and status of the termination agreement further violates § 13(d). The Complaint states that the defendants continuing failure to disclose material facts as required by § 13(d) is at issue. (D.I. 1 at 24.) The plaintiffs may attempt to show the facts stated in the proposed supplemental complaint as evidence of the defendants' continuing failure to satisfy the requirements of § 13(d). If it later appears necessary, the Court will allow a motion to amend the pleadings to the evidence entered to show a violation of § 13(d) in accord with this evidence. *See* Fed.R.Civ.P. 15(b).

## IV. CONCLUSION

The Court will grant in part and deny in part the defendants' Rule 12(c) motion to dismiss on the pleadings. Specifically, the Court will dismiss: (1) the plaintiffs' RICO claims in their entirety because the Complaint does not adequately allege a pattern of racketeering activity; and (2) the plaintiffs' claims for injunctive relief under § 14(a) of the 1934 Act. The Court will permit the plaintiffs to go forward with their § 13(d) claims. These claims encompass any omissions or misstatements made by the defendants in their 13D Schedules both before and after the commencement of this litigation. Lastly, since the plaintiffs have not alleged that the defendants owned 5% or more of the outstanding units of SEP III, only SPP and PPC will seek relief under § 13(d) of the 1934 Act. Accordingly, the claims of SEP III and SIG 86 will be dismissed in their entirety.

An Order will be entered in accordance with this Opinion.