**In re DELMARVA SECURITIES
LITIGATION.**

Civ. A. Nos. 91–130MMS, 91–283MMS.

United States District Court,
D. Delaware.

May 15, 1992.

Pamela S. Tikellis, James C. Strum (argued), and Edward Seglias, Greenfield & Chimicles, Wilmington, Del., and Richard D. Greenfield (argued), and Mark C. Rifkin, Greenfield & Chimicles, Haverford, Pa.; Of counsel: Gross & Metzger, Philadelphia, Pa., for plaintiffs.

Rodman Ward, Jr., (argued), Robert A. Glen, Cathy J. Pesta, Curtis S. Alva, Cathy L. Reese, and Jeff A. Shumway, Skadden, Arps, Slate, Meagher & Flom, Wilmington, Del., for defendants.

## OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

On March 15, 1991, plaintiff Anthony J. Cutrona ("Cutrona") commenced this litigation by filing a class and derivative action against defendants Nevius M. Curtis, Howard E. Cosgrove and H. Ray Landon and naming Delmarva Power & Light Company ("Delmarva" or "Company") as nominal defendants. On May 15, 1991, plaintiffs Leon and Cecelia Moskowitz ("Moskowitz") filed a class action naming as defendants Curtis, Landon, Cosgrove and Delmarva, and asserting claims very similar to the original Complaint filed by Cutrona. On June 10, 1991, this Court granted Cutrona's motion to dismiss Count V of the original Complaint. Also on June 10, 1991 plaintiffs filed a Consolidated and Amended Complaint (the "Amended Complaint") which, among other matters, deleted Count V (the derivative claim), named Delmarva as a defendant and added Roger D. Campbell as a defendant. The Amended Complaint alleges defendants violated Sections 10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C.

§§ 78j(b), 78n(a) and 78t(a)); Rules 10b–5 and 141–9 promulgated thereunder; Sections 11, 12 and 15 of the Securities Act of 1933 ("Securities Act") (15 U.S.C. §§ 77k, 77*l* and 77*o* ); and principles of common law. On June 12, 1991, this Court granted plaintiffs' motion to consolidate formally the Cutrona and Moskowitz actions.

Before the Court now is defendants' motion to dismiss the Consolidated and Amended Complaint based on Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court will grant defendants' motion to dismiss.

## I. Facts

In 1987, defendant Delmarva[1] began to diversify into non-regulated businesses. In its 1987 Annual Report, Delmarva announced that the diversification effort would be undertaken to realize higher rates of return by going into non-regulated businesses. A subsidiary of Delmarva, Delmarva Capital Technology Company ("DCT"), entered into three joint ventures. The joint ventures were two wood-waste co-generation plants in Redding and Burney, California, and a resource recovery facility ("trash to steam" plant) in Glendon, Pennsylvania. The total investment in these three ventures exceeded $54 million.

Early in 1990, Delmarva disclosed the three joint ventures were having problems. The first problem was announced in Delmarva's 1989 Annual Report and a Form 10–K filed with the SEC on March 23, 1990. These reports announced certain legal problems with the joint venture in Glendon. Then, in a Form 10–Q filed with the SEC on May 15, 1990, subsequent to the election of the defendant directors, Delmarva first indicated actual operating losses occurred at Redding and Burney due to unfavorable lumber market conditions. Delmarva also disclosed at this time that a construction

---

1. The defendants are: (1) Nevius M. Curtis, Chairman of the Board, President and Chief Executive Officer of Delmarva; (2) Howard E. Cosgrove, Executive Vice President and Director of Delmarva; (3) H. Ray Landon, Executive Vice President and Director of Delmarva; (4) Roger D. Campbell, Senior Vice President of Delmarva Capital Investments, Inc.; and (5) Delmarva, a company principally engaged in the generation and supply of electricity and natural gas in Delaware, Maryland and Virginia.

loan agreement for the Redding project had not been converted to a term loan as originally anticipated, that the City of Easton and the Borough of Glendon, Pennsylvania, had refused to issue a necessary waiver and permit for the Glendon resource recovery facility and that, although these refusals were being challenged by Delmarva, management could not predict the outcome of the appeals process.

In August 1990, Delmarva disclosed further problems at the joint ventures in California and Pennsylvania. At that time, Delmarva also reported that "the corporation holding DCT's co-generation plant in Redding, California was contemplating a bankruptcy filing because it was unable to meet its debt payment obligations." (Amended Complaint ("Am.Compl.") ¶ 41). Then, on October 30, 1990, Delmarva disclosed in its Quarterly Report to Stockholders that its "ultimate recovery of the investments" was uncertain and that "[i]f it becomes necessary to write-off the entire investment in these projects, the adverse effect on earnings could approach $0.90 per share." (Am.Compl. ¶ 41). On January 29, 1991, Delmarva disclosed that it was indeed writing down assets related to the three joint ventures at a cost of $0.89 per share, or a total of about $54 million. The write-off reduced the common stockholder's equity by approximately seven percent.

The defendants assert that several factors, beyond Delmarva's control, caused the failure of the investment in the joint ventures. The defendants urge that environmental and regulatory activities in the California ventures' operating area, combined with the demand for wood fuel by other similar projects in the area, resulted in high log and fuel costs. This high cost of logs, the major raw material for the California ventures' wood-burning power plants and adjoining sawmills, adversely affected the ability of the plants to operate profitably.

Plaintiffs[2] contend that from the outset, the defendants knew or should have known that the three joint ventures were ill-conceived, imprudent investments for Delmarva and were subject to an unacceptably high risk of loss. Moreover, plaintiffs contend that the operating and financial conditions of the joint ventures were concealed throughout 1989 and most of 1990. Plaintiffs allege that despite the growing problems during that time, Delmarva, through its public statements and publicly filed or disseminated documents, misled the market to believe that Delmarva's business, and in particular the diversification of its business, was successful and positioned to achieve consistent earnings growth for the Company. The plaintiffs claim that as a result, Delmarva's net income and assets were overstated materially and the market price of Delmarva common stock was artificially inflated throughout the Class Period, all for the purpose of assuring individual defendants were reelected as directors and officers. In other words, plaintiffs allege defendant directors "entrenched" themselves in their positions as directors by dissemination of false and misleading proxy statements for the 1988–90 annual meetings of Delmarva stockholders.

## II. Standard

Under Rule 12(b)(6), a count of a complaint may be dismissed for failure to state a claim only if, when accepting all factual allegations as true and drawing all reasonable inferences from these facts, no relief would be granted under any set of facts that could be proved. *Melo v. Hafer,* 912 F.2d 628, 634 (3d Cir.1990), *aff'd,* —— U.S. ——, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988) (citing *D.P. Enterprises, Inc. v. Bucks County Community College,* 725 F.2d 943, 944 (3d Cir.1984)).

## III. Judicial Notice of SEC Filings

 As a preliminary matter, plaintiffs contend defendants should not be per-

**2.** The plaintiffs are Anthony J. Cutrona, guardian of the property of Angeline and Samuel Cutrona, stockholders of Delmarva; and Leon and Cecelia Moskowitz, owners of shares of common stock purchased through the Dividend Re–Investment Plan ("DRIP"). The plaintiffs represent a putative class of all persons who acquired Delmarva common stock from approximately March 15, 1988 to January 29, 1991.

mitted to utilize public documents referenced in, but not attached to, the Amended Complaint. Plaintiffs urge that all "outside facts" should be stricken. However, all of the "outside facts" are taken from public documents filed with the Securities and Exchange Commission ("SEC"). This Court is free to take judicial notice of certain facts that are of public record if they are provided to the Court by the party seeking to have them considered. SEC filings fall within this category of public records that can be judicially noticed. *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir.1991). *See also Southmark Prime Plus, L.P. v. Falzone*, 776 F.Supp. 888, 892–93 (D.Del.1991) ("Judicial notice of public [*i.e.*, SEC] filings is ... appropriate under Rule 201(b)(2)); *cf. Massachusetts v. Westcott*, 431 U.S. 322, 323 n. 2, 97 S.Ct. 1755, 1756 n. 2, 52 L.Ed.2d 349 (1977) ("[R]ecords of the Merchant Vessel Documentation Division of the Coast Guard ... may be judicially noticed.").[3]

## IV. Count I: Section 10(b) and Rule 10b–5 Claims

### A. *Economic Loss*

 Defendants have moved to dismiss Count I, plaintiffs' federal fraud claim based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 140.10b–5 (1990), for failure to state a claim under Fed.R.Civ.P. 12(b)(6).

To state a claim under Rule 10b–5, the plaintiff must allege that the defendant

(1) with scienter—an intent to deceive, manipulate, or defraud, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194–214, 96 S.Ct. 1375, 1381–91, 47 L.Ed.2d 668 (1976),

(2) made misleading statements or omissions, *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 476–77, 97 S.Ct. 1292, 1302–03, 51 L.Ed.2d 480 (1977); *Schreiber v. Burlington Norther, Inc.*, 472 U.S. 1, 7–8, 105 S.Ct. 2458, 2462, 86 L.Ed.2d 1 (1985),

(3) of material fact, *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976),

(4) upon which the plaintiff—a purchaser or seller of the security, *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731–55, 95 S.Ct. 1917, 1923–35, 44 L.Ed.2d 539 (1975),

(5) relies in entering the transaction, *Basic, Inc. v. Levinson*, 485 U.S. 224, 243, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988), and

(6) which caused economic loss to the plaintiff. *In re Phillips Petroleum Securities Litigation*, 881 F.2d 1236, 1244 (3d Cir.1989); *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 683–86 (7th Cir.1990).

*Scattergood v. Perelman*, 945 F.2d 618, 622 (3d Cir.1991). Attention is turned to the sixth factor, economic loss.

The Amended Complaint variously states throughout the putative Class Period, March 15, 1988, to January 29, 1991, that because of defendants' alleged transgressions the market and issue prices of Delmarva's common stock were (1) "artificially inflated and maintained" (Am.Compl. ¶ 56), at artificially high levels (Am.Compl. ¶ 58), at artificially inflated levels (Am.Compl. ¶ 66), and (2) plaintiffs purchased Delmarva common stock for "excessive consideration" (Am.Compl. ¶ 57) or "artificially inflated prices." (Am.Compl. ¶ 77).

The Amended Complaint also alleges,

[o]n or about October 30, 1990, in the Company's Quarterly Report to Shareholders, Delmarva shocked the investing public when it announced further details with respect to its problems ... [and] the adverse effect on earnings could approach $0.90 per share.

(Am.Compl. ¶ 41). Amended Complaint ¶ 44 alleges "[i]n the wake of the foregoing announcements, the Company's common stock fell in value, continuing the deterioration in value which commenced as more and more of Delmarva's problems became

---

**3.** At oral argument, plaintiffs' counsel conceded: "I have no problem, as a practical matter, if your Honor looks at those documents as documents in the public record, *not for the veracity of the facts in them.*" Dkt. 47, p. 57.

publicly known." (Am.Compl. ¶ 44). The "announcements" presumably refer to the October 30, 1990, Quarterly Report suggesting it might be necessary to write off the entire investment with the adverse effect on earnings being $0.90 per share and the January 29, 1991, Quarterly Report announcing an actual write-off of $0.89 per share.

At oral argument plaintiffs' counsel stated unequivocally that the decline in value referenced in paragraph 44 of the Amended Complaint means a decline in the price of the stock. (Dkt. 47, at 88 and 96). However, the facts belie there was a drop in market price of Delmarva stock by reason of the announcements.[4] On October 29, 1990, the closing price of Delmarva stock was 18¾. On October 30, the date "Delmarva shocked the investing public," the closing price of Delmarva shares was 18⅝, a drop of ⅛ of a point from the preceding day. In the following four days, the closing prices of Delmarva stock were as set out in the margin.[5] Thus, Delmarva's "shock" to the investing public did not translate into a decrease in the market price of Delmarva shares. Similarly, on January 29, 1991, the date of the announcement of the write-off, there was no meaningful decline in the price of the shares.[6]

The case law establishes that a claimant may be compensated in a Section 10(b) and Rule 10b–5 action only for his economic injury. In *Sowell v. Butcher & Singer,* 926 F.2d 289 (3d Cir.1991), the Court of Appeals for the Third Circuit ruled that to prevail on a securities fraud claim under Rule 10b–5, the plaintiff must show, *inter alia,* that he suffered damages as a result of a misrepresentation or omission. *Id.* at 296 (citing *Angelastro v. Prudential–Bache Securities,* 764 F.2d 939, 942 (3d Cir.), *cert. denied,* 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985), and *Ketchum v. Green,* 557 F.2d 1022, 1025 (3d Cir.), *cert. denied,* 434 U.S. 940, 98 S.Ct. 431, 54 L.Ed.2d 300 (1977)); *accord Harris v. Union Electric Co.,* 787 F.2d 355, 362 (8th Cir.) (a plaintiff in a Rule 10b–5 action must establish injury), *cert. denied,* 479 U.S. 823, 107 S.Ct. 94, 93 L.Ed.2d 45 (1986); *Mills v. Electric Auto–Lite Co.,* 552 F.2d 1239 (7th Cir.), *cert. denied,* 434 U.S. 922, 98 S.Ct. 398, 54 L.Ed.2d 279 (1977) (dismissing a securities case on the ground that the plaintiff could not establish that in the absence of the fraud he would have received a greater price); *Bastian v. Petren Resources Corp.,* 682 F.Supp. 956, 957 (N.D.Ill.1988) (injury is a necessary element of a Section 10(b) or Rule 10b–5 claim). *See also* Jacobs, 5C *Litigation and Practice Under Rule 10b–5,* § 260.03[a] at 11–23 (2d ed. 1991) (In a 10b–5 action, "a claimant should be compensated only for his economic injury."). The *Sowell* court further added that while "damages may be measured in several ways ... [in a 10b–5 claim] ... a plaintiff's damages are most commonly calculated as the difference between the price paid for a security and the

---

**4.**

| Date | Delmarva Stock Closing Price As Reported in Standard and Poors Corporation, Daily Stock Price Record of the New York Stock Exchange, Oct.–Dec. 1990 ed. |
| --- | --- |
| 10/29/90 | 18¾ |
| 10/30/90 | 18⅝ |
| 10/31/90 | 18¾ |
| 11/01/90 | 18¾ |
| 11/02/90 | 19 |
| 11/05/90 | 19 |

**5.** The Court may take judicial notice of closing stock prices pursuant to Federal Rule of Evidence 201(f). *See FMC Corp. v. Boesky,* 727 F.Supp. 1182, 1196 n. 17 (N.D.Ill.1989); *Baumel v. Rosen,* 283 F.Supp. 128, 144 n. 8 (D.Md.1968), *aff'd in part, rev'd in part on other grounds,* 412 F.2d 571 (4th Cir.1969), *cert. denied,* 396 U.S. 1037, 90 S.Ct. 681, 24 L.Ed.2d 681 (1970); *Jacob-*

*son Manufacturing Co. v. Sterling Precision Corp.,* 282 F.Supp. 598, 602 (E.D.Wis.1968); Weinstein & Berger, 1 *Weinstein's Evidence,* ¶ 201[06], at 201–60 (1988) (court may take judicial notice at any stage of the proceeding); Fed. R.Evid. 201(f).

**6.**

| Date | Delmarva Stock Closing Price As Reported in Standard and Poors Corporation, Daily Stock Price Record of the New York Stock Exchange, Jan.–March 1991 ed. |
| --- | --- |
| 1/28/91 | 17 |
| 1/29/91 | 16⅞ |
| 1/30/91 | 16¾ |
| 1/31/91 | 17 |
| 2/01/91 | 17 |

security's 'true value.' " *Sowell, supra* at 297.[7] The court also stated that it is incumbent upon the plaintiff to provide evidence of the "true value" of the securities to calculate the damages. *Id.* Finally, the court observed that the "true value" of the stock is "the value which the market would have assigned to the stock had there been no wrongdoing on the part of the defendants." *Id.* at 297–98.

The closing price of Delmarva stock on January 29, 1991, was 1½ points lower than on October 30, 1990. Based on this slight drop, it might fairly be said that the closing price of Delmarva stock did not, therefore, react adversely to either "announcement" and did not cause plaintiffs to suffer an economic injury for Section 10(b) and Rule 10b–5 purposes. Indeed, instead of a slight drop, one would have expected the price to drop significantly as plaintiffs allege they purchased Delmarva shares at artificially inflated prices. Despite this observation, Count I will not be dismissed by reason of plaintiffs' failure to suffer any economic injury because it is *possible*, given the volatility of stock prices, that an economic loss did in fact occur on or about October 30th, but that the loss was masked by external factors which placed upward pressure on the price of Delmarva stock, keeping it from falling in reaction to the announcement.[8]

## B. *Corporate Mismanagement and Breach of Fiduciary Duty*

In Count I plaintiffs contend that, throughout the Class Period, the true financial and operating conditions and prospects of Delmarva's non-regulated subsidiaries and the Company itself were concealed from the investing public by the defendants in a deliberate attempt to lull the public into believing that the fiscal integrity of the Company and its non-regulated subsidiaries were maintained through sound and conservative investment policies. *See* Am.Compl. ¶¶ 47–48. The plaintiffs allege that defendant Delmarva, in many public statements, including annual and quarterly reports to shareholders and the SEC during the putative Class Period, and by other false and misleading means, is liable as a primary violator of Section 10(b) and Rule 10b–5 of the Exchange Act.[9] Defendants contend these allegations merely amount to a failure to disclose mismanagement and breach of fiduciary duty.

■ The Exchange Act was intended principally to protect investors against manipulation of stock prices through regulation of transactions upon securities exchanges, and to impose regular reporting requirements on companies whose stock is listed on national securities exchanges. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668, *reh. denied*, 425 U.S. 986, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976). *See also Basic Inc. v. Levinson*, 485 U.S. 224, 230, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988) (The Supreme Court has "repeatedly described the 'fundamental purpose' of the [Exchange] Act as implementing a 'philosophy of full disclosure.' "). It is well-established, however, that failure to disclose mere mismanagement is not cognizable under the federal securities laws. *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

■ In *Santa Fe*, the Supreme Court articulated two distinct but related rationales for refusing to recognize as federal securities violations failure to disclose internal corporate mismanagement: (1) corporations are creatures of state law, and investors commit their funds to corporate

---

**7.** The Court of Appeals for the Seventh Circuit has observed that:

> If, for example, a firm reveals that an earlier public statement was mistaken, but the price of the securities does not move in response, the investors suffer no damages. The plaintiff must prove damages, must establish the difference between the price received in fact and the price that would have been received but for the fraud.

*Harris Trust and Sav. Bank v. Ellis*, 810 F.2d 700, 706 (7th Cir.1987).

**8.** Although this issue was raised at oral argument, it was not briefed, possibly because of the procedural posture of the case.

**9.** Plaintiffs also contend that the individual defendants are liable to the plaintiffs as "control persons." *See* Am.Compl. ¶ 55.

directors on the understanding that, except where federal law *expressly* requires certain responsibilities of directors with respect to stockholders, state law governs the internal affairs of the corporation; and (2) Congress by enacting Section 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement. *Id.* at 479, 97 S.Ct. at 1304. Accordingly, *Santa Fe* instructs that a breach of fiduciary duty (such as mismanagement) is not actionable under Section 10(b) or Rule 10b–5 if the alleged wrongdoing does not include "any deception, misrepresentation, or nondisclosure" of material facts. *Id.* at 476, 97 S.Ct. at 1302.[10]

*Sante Fe,* however, does not insulate every act of mismanagement from scrutiny under the federal securities laws. A company cannot use deception to cover-up mismanagement or disseminate materially false statements regarding its financial or operating conditions just because those conditions may involve mismanagement. Although a company has no duty to affirmatively disclose mismanagement standing alone, *Santa Fe* does not create a safe harbor to immunize companies from liability under the federal securities laws whenever mismanagement happens to be present. *See, e.g., Pellman v. Cinerama, Inc.,* 503 F.Supp. 107, 109 (S.D.N.Y.1980) (*Santa Fe* does not immunize officers and directors from federal liability whenever their misconduct also happens to violate state-law fiduciary duties.). Plaintiffs argue that the Amended Complaint alleges more than ordinary mismanagement. They contend that they have pled the failure to disclose material information about financial and operating conditions and prospects of the non-regulated joint ventures and, therefore, *Santa Fe* does not preclude liability.

The United States Court of Appeals for the Third Circuit interpreted *Santa Fe* in *Craftmatic Securities Litigation v. Kraftsow,* 890 F.2d 628 (3d Cir.1989). In *Craftmatic,* the purchaser of Craftmatic stock alleged the corporation's failure to disclose the riskiness of some of its ventures constituted a violation of federal securities laws. Based on a failure to state a federal claim, the Court of Appeals affirmed the District Court's dismissal of the allegations "that defendants omitted information, disclosure of which would serve only to place investors on notice of management problems and poor business judgments." *Id.* at 646. The Court, however, reversed the dismissal of the subparagraphs of the complaint which involved more than a breach of faith or ineptitude on the part of management.

In so concluding, the Third Circuit Appellate Court was mindful that it is often difficult to distinguish a claim which involves ordinary mismanagement from one which is actionable under the securities laws. Indeed, the Appellate Court noted:

> The line between a material nondisclosure and the nondisclosure of mere mismanagement is often difficult to draw. Arguably, any action amounting to corporate mismanagement would be material, that is, substantially likely to assume significance in the decisionmaking of the reasonable investor. However, courts have been reluctant to permit a federal securities claim to stand when the plaintiff has failed to allege more than nondisclosure of mismanagement. . . .

*Craftmatic Securities Litigation v. Kraftsow,* 890 F.2d 628, 639 (3d Cir.1989) (citations omitted).

The "crucial difference" between a case of ordinary mismanagement and a case which is actionable under federal securities law is "whether there was misrepresentation or omission in the flow of materi-

---

**10.** An omitted fact or misleading statement must be material in order to be actionable under the securities laws. An omitted fact or a misleading statement is material if there is a "substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." *TSC Industries,*

*Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). In the case of an omission, federal securities law is violated if there is a "substantial likelihood that disclosure 'would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information' available. . . ." *TSC,* 426 U.S. at 449, 96 S.Ct. at 2132.

al information." In essence, the *Craftmatic* court upheld the dismissal of only those allegations relating to the manner in which the company was managed that were completely unrelated to specific representations in the company's prospectus. The Court of Appeals reversed the District Court's dismissal of the allegations pertaining to false or misleading statements made in the prospectus, even though those allegations related to the way in which the company was being or had been managed. *Craftmatic*, 890 F.2d at 640. *Craftmatic*, therefore, stands for the basic proposition that: a cause of action is present under the federal securities laws when a complaint pleads an allegation of mismanagement *plus* some material omission or misrepresentation. *Id.* at 640. However, as will be seen *infra* pp. 1303–1304, more is required where plaintiff's objection is an allegation of failure to establish reserves.

Applied to the facts of this case, the *Craftmatic* court's initial observation that "[t]he line between a material nondisclosure and the nondisclosure of mere mismanagement is often difficult to draw" is apropos to the Amended Complaint. The only asserted scheme or artifice to defraud is the alleged goal of entrenching senior management in their corporate positions as set forth in paragraph 29 of the Amended Complaint.[11] Entrenchment claims are state law fiduciary claims, not federal claims. *See Speiser v. Baker*, 525 A.2d 1001 (Del. Ch. 1987). It follows the Amended Complaint is premised upon state law acts of corporate mismanagement and breach of fiduciary duty with the objective being the goal of entrenchment.

■■■■ Not every state law corporate mismanagement case with an avowed goal of entrenchment can be turned into a federal securities claim by baldly alleging misrepresentation and/or concealment. The federal securities law goal of full disclosure of material information is only implicated at such point where there is misrepresentation and concealment through deception or manipulation of material adverse facts which occur as a result of corporate mismanagement.

■■■■ Determining whether a case implicates state or federal law requires precise fact-specific line drawing. In drawing such lines, certain principles become clear. Acts of corporate mismanagement predicated upon going into another substantial business, no matter how unwise, are not actionable under the federal securities laws so long as there is timely full disclosure of the fact of going into the business and no deception or manipulation. *Santa Fe*, 430 U.S. at 476–77, 97 S.Ct. at 1302–03. Statement of goals and/or reasons for going into another line of business do not constitute actionable misrepresentations so long as they are issued with a reasonable genuine belief or basis at the time they are made. *Herskowitz v. Nutri/System, Inc.*, 857 F.2d 179, 184 (3d Cir.1988), *reh. denied*, *cert. denied*, 489 U.S. 1054, 109 S.Ct. 1315, 103 L.Ed.2d 584 (1989) (citing *Eisenberg v. Gagnon*, 766 F.2d 770, 776 (3d Cir.), *cert. denied*, 474 U.S. 946, 106 S.Ct. 342, 343, 88 L.Ed.2d 290 (1985)). There is a duty to timely disclose material adverse occurrences and results even if they flow from corporate mismanagement. *Craftmatic*, 890 F.2d at 639.

■■■■ If adverse consequences necessitate establishing of reserves, the shareholders are entitled to know of that fact upon the happening of those specific occurrences. To determine whether adequate disclosure has been made, therefore, timing is key both as to the announcement of material adverse effects and the concomitant necessity for establishing reserves. As a necessary corollary, it is not enough to state a cause of action under Section 10(b) and Rule 10b–5 that acts of corporate mismanagement ultimately resulted in ma-

---

11. Paragraph 29 of the Amended Complaint reads:

 29. The aforementioned statements and others similar to them were intended to and did mislead Delmarva's shareholders and the investing public throughout the Class Period and were intended to portray the Company in the best possible light and to permit senior management to retain their positions and the benefits attendant thereto.
(Am.Compl. ¶ 29).

terial losses to the corporation. That, in and of itself, is only a state law claim. Rather, so long as the information is available to plaintiffs the complaint must state precisely and with particularity (1) when the events or adverse effects occurred and (2) in which public documents or statements the events or adverse effects should have been disclosed.

The Amended Complaint will be examined in light of the foregoing principles. The gravamen of the Amended Complaint is that Delmarva misrepresented to, and concealed from, its shareholders material information and failed to provide for adequate reserves to cover the misfortunes of the three joint ventures consisting of two wood-waste co-generation plants in California and a trash-to-steam plant in Glendon, Pennsylvania.

Paragraphs 25 and 26 of the 35–page, 87 paragraph Amended Complaint are the only paragraphs from which statements from any public documents disseminated during the putative Class Period are quoted.[12] The pertinent portion of those paragraphs follows:

25. During the Class Period, the defendants attempted to put the "best face" on the foregoing diversification efforts despite their knowledge that each of such ventures had major shortcomings which, ultimately, would have to be acknowledged publicly or in reckless disregard thereof. In Delmarva's 1988 Annual Report, for example, it is stated deceptively: "In addition, the experience gained from subsidiary activities contributes to the Challenge 2000 effort. Through developing wood-burning power plants in California and a trash-burning generator in Pennsylvania, the company will *not only earn good returns but is*

*also acquiring the expertise* to prepare for the development of non-utility generators and positioning itself to take advantage of opportunities in this area." [Emphasis in Amended Complaint.]

26. The 1988 Annual Report went on to say: "Several subsidiary projects have made progress in supporting the subsidiary philosophy of *supplementing earnings and seeking returns which exceed those of the regulated business* while not detracting from the core operation of the energy company. The 240–MW wood-burning plant in Redding, California began operating in January of 1989. A sister unit in Burney, California will become operational by the end of 1989. A 500–ton–per–day trash burning facility to be located in Glendon, Pa. is in the permitting process. A 34–acre municipal landfill is under construction in Schuylkill County, Pa. to be used in conjunction with the Glendon plant." [Emphasis in Amended Complaint.]

(Am.Compl. ¶¶ 25, 26). Both quotations are from the 1988 Annual Report disseminated to shareholders in 1989. If plaintiffs are urging through the above-quoted statements that defendants should never have initiated the three subsidiary projects, plaintiffs are merely asserting a state law corporate mismanagement claim and/or a state law breach of fiduciary duty claim. In either case, the claim is not actionable under Section 10(b) and Rule 10b–5. If, on the other hand, plaintiffs are urging reserves should have been provided in the financials which presumably accompanied the 1988 Annual Report, plaintiffs' position is rejected as there is nothing in the Amended Complaint to suggest why reserves should have been established unless

12. Paragraph 20 of the Amended Complaint references a public document disseminated prior to the putative Class Period. It reads as follows:
 20. In this connection, prior to the commencement of the Class Period, the defendants promised to Delmarva's shareholders and to the investing public generally that the Company would embark upon such a diversification program and allegedly, as part of and/or in connection with its "Challenge 2000" plan, Delmarva maintained that it "had

developed a plan to assure customers of adequate supplies of electric energy at the lowest reasonable cost through the year 2000." As stated in the Company's 1987 Annual Report, issued on or after February 11, 1988: "the philosophy of the subsidiary efforts is to seek returns which exceed those of the regulated business and not detract from the core operation of the parent energy company."
(Am.Compl. ¶ 20).

one assumes Delmarva went into the joint ventures with the intent to lose money.

■ According to paragraph 27 of the Amended Complaint,[13] the two wood-waste co-generation plants failed because of inadequate capitalization (Am.Compl. ¶ 27(b)), and environmental and regulatory efforts which significantly curtailed logging (Am. Compl. ¶ 27(c)), thereby making the cost so high as to preclude profitable operations. (Am.Compl. ¶ 27(a) and (c)). Paragraph 27 must be stricken for two reasons: first, it only alleges corporate mismanagement; second, it fails to comply with Fed.R.Civ.P. 9(b).

■ Rule 9(b) of the Federal Rules of Civil Procedure reads:

**(b) Fraud, Mistake, Condition of the Mind.** In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Fed.R.Civ.P. 9(b). Despite the apparently strict requirements of the rule, the Court of Appeals for the Third Circuit has held that it is appropriate to relax the particularity requirement of Rule 9(b) in securities cases "when factual information is peculiarly within the defendants' knowledge or control...." *Craftmatic*, 890 F.2d at 645. In so ruling, the Court of Appeals, recognized that a requirement to set forth knowledge any more specifically at the outset of litigation, when such knowledge is exclusively within the control · of defen-

dants, would pose an insurmountable obstacle. *Id.* at 645–46. Thus, in a securities case the particularity requirement of Rule 9(b) is satisfied when plaintiffs (1) allege information within the defendants' exclusive control, and· (2) support their allegations with statements of facts which indicate that the charges are not baseless. *Id.* at 645.

In this case, however, plaintiffs have failed to show that the relevant information was peculiarly within the defendants' knowledge. Environmental and regulatory efforts by their very nature are not conducted in secret. Such efforts are public knowledge available to plaintiffs as well as defendants. Yet plaintiffs have not identified (1) what environmental and regulatory actions were implicated, (2) when they were initiated and resolved, (3) which and when each regulation had an adverse effect on the joint ventures, and (4) when during the Class Period that adverse effect on the joint ventures became so pronounced as to warrant disclosure and establishment of more reserves by Delmarva.

In addition, plaintiffs have alleged no facts demonstrating Delmarva's release of information was either untimely or insufficiently comprehensive with respect to the California wood-waste co-generation joint ventures. *See* Fed.R.Civ.P. 9(b). That portion of Count I, therefore, relating to the misrepresentations and concealment, with respect to the California wood-waste co-generation joint ventures, will be dismissed for failure to state a claim insofar as it is

---

**13.** Paragraph 27 of the Amended Complaint reads as follows:

27. Despite the glowing promotion of Delmarva's diversification efforts, the defendants knew or should have known at the time the Company proceeded with its investments and thereafter that:

(a) the two projects in California consisted of primarily wood-burning power plants and adjoining sawmills, which were to provide the major source of fuel for the power plants as well as finished lumber and that, because of the unavailability of a consistent source of economically priced logs, given the high cost of what was available, the plants could not operate profitably;

(b) the joint ventures in California were inadequately capitalized and, almost from the outset, were in dire straits and without sufficient cash flow to operate successfully;

(c) environmental and regulatory efforts were actively underway in the California ventures' operating area which significantly curtailed logging and, because of the demand for wood fuel by other similar projects in the area, high log and fuel costs prevailed; and

(d) DCT's investment in Glendon was at substantial risk since its partner, Energencies/Glendon of Easton, Pennsylvania had not been able to obtain a favorable resolution of certain issues (including proximity to the Easton park) regarding conditions in its environmental permit and acceptable financing for the facility all of which was highly unlikely.

(Am.Compl. ¶ 27).

based upon environmental and regulatory efforts. Also, the same deficiencies constitute a failure to plead fraud with particularity as required by Fed.R.Civ.P. 9(b).[14]

 In paragraph 39 of the Amended Complaint[15] plaintiffs urge defendants failed to disclose litigation which was apparently taking place in California. Although information about that litigation was readily available to plaintiffs in the public record, plaintiffs have not even identified the litigation by caption and/or civil action number. While the Amended Complaint makes clear the litigation involves the California wood-waste co-generation joint ventures, it is unknown whether Delmarva, its wholly owned subsidiary, Delmarva Capital Technology Company, the joint venture entities or the individual defendants were parties or were simply affected by the litigation.[16] Further, without more factual allegations, it is unknown when the complaint was filed, what the complaint was about, and when the litigation reached a stage that one could tell its "likely results" and when and why it would have an impact on the joint ventures so material as to call into play Delmarva's duty to both disclose the litigation and/or establish reserves. Insofar as Count I is predicated upon a failure to make sufficient and adequate disclosure of the California litigation, it will be dismissed both for failure to state a claim and because it lacks the requisite particularity to comply with Fed.R.Civ.P. 9(b).

 Like the California joint ventures, the only publicly disseminated references to the Pennsylvania trash-to-steam plant are contained in paragraphs 25 and 26 of the Amended Complaint.[17] What occurred and when the occurrences happened during the permitting process, including receipt by the joint venture of adverse decisions, is in the public domain and available to plaintiffs. If plaintiffs' cause of action is predicated on a theory that defendants should not have entered into the trash-to-steam joint venture because of the difficulty of obtaining the necessary permit, it is not actionable under Section 10(b) and Rule 10b-5 as it would only constitute a state law claim of corporate mismanagement. The Amended Complaint does not reveal when and why during the permitting process disclosures should have been made and reserves established. Thus the allegation that:

> these material misrepresentations and omissions were contained in and omitted from, *inter alia,* the press releases, filings with the SEC, including Forms 10-K, 10-Q and 8-K, and Registration Statements, Quarterly and Annual Reports to Shareholders, and other documents, described above, disseminated publicly during the Class Period, which were prepared in the name of Delmarva with the participation, acquiescence, cooperation, encouragement, and assistance of the individual defendants and those advising them[ ]

(Am.Compl. ¶ 48) is lacking in the requisite particularity. *See* Fed.R.Civ.P. 9(b). The Amended Complaint does not identify any press release and because the Amended Complaint does not reveal when the adverse decisions were made during the permitting process, it is unknown when and what public documents should have reflected what was occurring. Count I will be dismissed both for failure to state a

---

**14.** *See* p. 33, *infra,* summarizing the reasons for dismissal of various paragraphs of Count I.

**15.** Paragraph 39 of the Amended Complaint reads:

> 39. In addition, defendants failed to sufficiently and adequately disclose the California litigation involving the Redding and Burney joint ventures, including the likely results of the litigation, its impact on the financial condition and prospects of those joint ventures, Delmarva and/or its subsidiaries and the po-

tential liability of Delmarva and/or its subsidiaries in connection with the litigation. (Am.Compl. ¶ 39).

**16.** One may surmise Delmarva or its subsidiaries were parties since the Amended Complaint speaks of "potential liability of Delmarva and/or its subsidiaries...." However, this is speculation exacerbated by the fact that the Amended Complaint complains of loss by reason of an unwise investment, not liability arising from litigation.

**17.** *See* p. 1304, *supra.*

claim and for lacking the degree of particularity required by Fed.R.Civ.P. 9(b).

■ Because Count I will be dismissed in its entirety, individual paragraphs of the Amended Complaint will receive abbreviated treatment. In addition to paragraphs 27(a), (b), (c) and (d) and 39 discussed above, paragraphs 21,[18] 23,[19] 29,[20] 32,[21] and 49(a), (b) and (c) [22] will be dismissed 'for failure to state a claim because they only allege corporate mismanagement or breach of fiduciary duty.

Paragraphs 21, 23 and 32 are plain and simple allegations of corporate mismanage-

**18.** Paragraph 21 of the Amended Complaint reads as follows:

> 21. In furtherance of their plan to diversify Delmarva, the individual defendants and the remainder of the Company's Board of Directors planned a number of acquisitions and new ventures well beyond management's area of expertise, some of which were geographically and culturally quite distant from the Company's headquarters.

(Am.Compl. ¶ 21).

**19.** Paragraph 23 of the Amended Complaint reads as follows:

> 23. Each of the foregoing projects was ill-conceived and left largely to absentee management under the control of DCT's joint venture partners. Further, in the case of the Glendon facility, it was proposed to be within 300 yards of a public park in Easton, Pennsylvania and its construction would have been directly contrary to a state regulation governing the proximity of such facilities to public parks. As such, these projects were not prudent investments for Delmarva and subjected to an unacceptably high risk of loss. At no time during the Class Period was the riskiness of these projects disclosed publicly.

(Am.Compl. ¶ 23).

**20.** Paragraph 29 of the Amended Complaint reads as follows:

> 29. The aforementioned statements and others similar to them were intended to and did mislead Delmarva's shareholders and the investing public throughout the Class Period and were intended to portray the Company in the best possible light and to permit senior management to retain their positions and the benefits attendant thereto.

(Am.Compl. ¶ 29).

**21.** Paragraph 32 of the Amended Complaint reads as follows:

> 32. Defendants concealed the material facts, as described more fully herein, in an effort to maintain the perception of Delmarva as a conservative, growing institution with high asset quality when, in fact, the growth in

ment by reason of taking what plaintiffs perceive as non-disclosed risks. Paragraph 29 can only be read as an allegation that management sought to entrench itself. Entrenchment is a state law fiduciary claim. *Field v. Trump*, 850 F.2d 938, 948 (2d Cir.1988), *cert. denied*, 489 U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989). Paragraphs 49(a), (b) and (c) are quintessential examples of allegations of corporate mismanagement and breach of fiduciary duty.

■ The degree of particularity required of the Amended Complaint is dictat-

assets and the expansion of its non-regulated business were illusory and did not reflect reasonably-anticipated returns on such investments. Thus, rather than being a conservative business institution with virtually all of its operations in the Delmarva Peninsula, the Company was taking undisclosed substantial risks by, *inter alia*, expanding recklessly and failing to reserve adequately against potential losses and the inevitable decline in the value of its non-regulated subsidiaries, which was reflected ultimately in massive write-offs and a substantial decline in the value of the Company's common stock.

(Am.Compl. ¶ 32).

**22.** Paragraph 49(a), (b) and (c) reads as follows:

> 49. The material facts which were misleadingly and/or intentionally misstated or omitted by defendants during the Class Period, include, but are not limited to, the following:
>
> (a) that Delmarva had over-expanded its non-regulated business in a relatively short-term effort to inflate its reported earnings and maintain dividends, and generate a higher rate of return on investment than that of its regulated businesses, in the process making substantial acquisitions of questionable and speculative businesses, thereby exposing the Company to serious ultimate risk of material losses, only a small fraction of which had been reflected adequately in Delmarva's reserves or otherwise classified by the Company as non-performing assets;
>
> (b) that the Company, principally at the urging of the individual defendants, proceeded to expend massive sums recklessly and without adequate investigation and determination that such businesses could be profitably operated by Delmarva or DCT;
>
> (c) that Delmarva would be able to sustain its history of growth and dividend payments when, in fact, the Company's ability to maintain its level of earnings and to pay common dividends at historic and regular rates was and is in jeopardy;
>
> . . .

(Am.Compl. ¶ 49(a), (b) and (c)).

ed by the fact that only the misrepresentations or omissions with respect to the effects of corporate mismanagement are actionable. Where the facts giving rise to those effects are ascertainable by plaintiffs through reasonable investigation of public records, plaintiffs must allege those facts and relate them in time to any material misrepresentation or omission sought to be charged to defendants. If the rule were otherwise, plaintiffs could slip through the back door what it cannot bring through the front door, *viz.*, state a Section 10(b) claim for corporate mismanagement. Accordingly, subparagraphs (b) and (c) of paragraph 49 also lack the requisite particularity such as what were the "prevailing economic conditions" and in which "publicly disseminated reports and statements" the reserves should have been established.

 At paragraph 40 plaintiffs state, "throughout most of the Class Period, the subsidiaries' value was overstated by more than $25 million." There is, however, no allegation of specific facts fixed in time as to when and why certain reserves should have been established. The joint ventures were going forward throughout a substantial part of the putative Class Period. (Am. Compl. ¶¶ 25 and 26). But plaintiffs have supplied no facts as to when during the Class Period adverse information giving rise to the need for establishing reserves should have been publicly disseminated even though that information was ascertainable through examination of public records. Accordingly, Amended Complaint ¶ 49(d) and (e) will be dismissed because of failure to comply with Fed.R.Civ.P. 9(b).[23]

 Paragraphs 50[24] and 52[25] of the Amended Complaint, like paragraphs 49(d) and (e), fail for lack of particularity. Specifically, they fail to identify what "facts" and when public documents issued during the Class Period were false and misleading. Finally, paragraph 58[26] of the Amended Complaint fails because it does not identify the objectionable "misstatements and/or omissions."

In summary, paragraphs 27, 39 and 49(b) and (c) will be dismissed because they fail to state a claim and for lack of specificity required by Fed.R.Civ.P. 9(b). Paragraphs 21, 23, 29, 32 and 49(a) will be dismissed for failure to state a claim. Paragraphs 48, 49(d) and (e), 50, 52 and 58 will be dis-

23. Paragraphs 49(d) and (e) read as follows:
 (d) that Delmarva's reserves were woefully insufficient to cover the reasonably expected losses in the Company's non-regulated business in light of the prevailing economic conditions and the concomitant high risk of failure of such businesses; and
 (e) that Delmarva's assets, earnings and net worth were materially overstated in its publicly disseminated reports and statements as a result of defendants' illegal conduct alleged more fully herein.
 (Am.Compl. ¶ 49(d) and (e)).

24. Paragraph 50 of the Amended Complaint reads as follows:
 50. Throughout the Class Period, defendants knowingly or recklessly disregarded facts known or available to them and/or concealed or specifically misrepresented to the investing public the true nature, causes and extent and financial consequences of the problems in Delmarva's non-regulated subsidiaries and with respect to the Company generally. Such statements were false and misleading and were intended to convey the false impression that Delmarva was financially healthy, properly and prudently managed, and that its reserves against losses in its non-regulated businesses were adequate.

(Am.Compl. ¶ 50).

25. Paragraph 52 of the Amended Complaint reads as follows:
 52. Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading or recklessly disregarded that the statements were materially false and misleading; knew or should have known that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents.
 (Am.Compl. ¶ 52).

26. Paragraph 58 of the Amended Complaint reads as follows:
 58. Each of such misstatements and/or omissions were interconnected and each of them, singly and cumulatively, concealed the true financial and operating condition of Delmarva from plaintiffs and the other members of the Class. All of such acts had the effect of supporting the market and/or issuance prices for Delmarva common stock at artificially high levels throughout the Class Period, although such artificial inflation was at different degrees at different times during such period.

missed for failure to abide by pleading with the requisite degree of particularity required by Fed.R.Civ.P. 9(b).[27]

## V. Count II

### A. *Section 12(2)*

 In order to have standing to bring a claim under Section 12(2) of the Securities Act, plaintiffs must allege they purchased newly issued shares in an initial offering from the defendants. *Ballay v. Legg Mason Wood Walker, Inc.*, 925 F.2d 682, 684, 692 (3d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991). These allegations are absent from paragraph 62 of the Amended Complaint which pleads defendant Moskowitz's DRIP purchase. (Am.Compl. ¶ 62). Delmarva sold both newly issued shares and shares purchased on the open market through the DRIP. (Dkt. 38, Shumway Aff., Exh. 5, pp. 2, 5, 6 and 11).

In addition, for a plaintiff to have standing, the security must be sold to him/her by means of a prospectus or oral communication. 15 U.S.C. § 77*l*(2) (1988). Although the Amended Complaint refers to Delmarva's prospectuses allegedly issued on eight separate occasions, it neglects to assert that Moskowitz purchased stock pursuant to any of the eight prospectuses. No allegation is made concerning any oral communications. The Amended Complaint,

therefore, never actually alleges that Moskowitz purchased newly issued shares sold by means of a prospectus or oral communication, nor do the plaintiffs make such a claim in their brief. The same is true for Cutrona, who did not even purchase stock through the DRIP.

Accordingly, none of the plaintiffs have standing under Section 12(2). As Professor Newberg makes clear, "the proper procedure when the class plaintiff lacks individual standing is to dismiss the complaint...." 1 H. Newberg, *Newberg on Class Actions*, § 2.09 at 64 (2d ed. 1985).[28] The Section 12(2) claim will be dismissed as to the individual defendants.

### B. *Section 11(a)*

 The Section 11(a) claim fails for the same reason as the Section 12(2) claim. Congress' intent in enacting the entire Securities Act was to regulate initial offerings. *Ballay, supra,* at 690.[29] According to *Ballay*, Section 11 "deal[s] with initial distribution[s] ...," not with secondary offerings. *Id.* at 691. Plaintiffs have not alleged they purchased newly issued shares in an initial offering. Therefore, the Section 11(a) claims will be dismissed for lack of standing.[30]

### C. *Section 15*

Plaintiffs also allege in Count II a violation of Section 15 of the Securities Act.

(Am.Compl. ¶ 58).

27. Given that Count I has been dismissed, the Court does not reach plaintiffs' Section 20(a) controlling person issue or an aiding and abetting issue.

28. Alternatively, plaintiffs urge that if they have standing to bring a Section 10(b) claim, they can litigate "all related securities laws claims" even if they do not have standing to bring such claims. (Pl.Br. at 42). Plaintiffs, however, cite no authority, and independent research by the Court has found none, to support this creative proposition. Further, plaintiffs argue there is at least a possibility that Moskowitz purchased newly issued shares from Delmarva through the DRIP and because he would have to prove those facts at trial, he should be relieved of his obligation to plead standing at this time. Likewise, plaintiffs cite no authority to support this second novel proposition.

29. In the House Report accompanying the Securities Act, Congress explicitly asserted:

> The bill affects only new offerings of securities sold through the use of the mails or of instrumentalities of interstate or foreign transportation or communication. It does not affect the ordinary redistribution of securities unless such redistribution takes on the characteristics of a new offering by reason of the control of the issuer possessed by those responsible for the offering.

H.R. No. 85, 73d Cong., 1st Sess. 7 (1933); *see also, e.g., Panek v. Boguez,* 718 F.Supp. 1228, 1232 (D.N.J.1989).

30. Even if the plaintiffs had standing to allege a Section 11(a) violation, that claim would be dismissed as to defendant Campbell. According to the plain terms of Section 11(a), the only persons who can be sued under that section are (1) persons who signed the registration statement; (2) directors; (3) persons named in the registration statement as about to become a director; (4) certain professionals who helped to prepare the registration statement; and (5) underwriters. Campbell does not fit into any of these categories.

However, a Section 15 violation is predicated on liability under Sections 11 or 12 of the Securities Act.[31] Because there was no adequately pled allegation of a violation of either Section 11 or 12, the claim based on Section 15 must also fail. Accordingly, plaintiffs' Section 15 claim will be dismissed.

## VI. Count III: Negligent Misrepresentation

### A. *Standing*

■ Count III alleges a Delaware state law claim for negligent misrepresentation against the individual defendants. Defendants contend that Count III should be dismissed because plaintiffs lack standing to assert a claim for negligent misrepresentation under Delaware law.

■ The Delaware courts have adopted the position of the *Restatement (Second) of Torts* § 552 (1977) on the extent of liability for the negligent dissemination of information by a professional. Under this rule, the general principle is that a claim of negligent misrepresentation may be brought only by members of " 'a limited group of persons for whose benefit and guidance' the information is intended." *Brug v. The Enstar Group, Inc.,* 755 F.Supp. 1247, 1258 (D.Del.1991) (quoting *Insurance Co. of North America v. Waterhouse,* 424 A.2d 675, 678 (Del.Super.Ct.1980), and *Restatement (Second) of Torts* § 552(a) (1977)). *See also Gilbane Bldg. Co. v. Nemours Foundation,* 606 F.Supp. 995, 1001 (D.Del.1985). In *Brug,* which involved a claim similar to that of the instant case, this Court ruled that the plaintiffs failed to situate themselves within a limited group of persons who could bring a claim for negligent misrepresentation. Like *Brug,* the only documents which plaintiffs identify as containing the alleged

misrepresentations are documents released to the public at large. In denying the claim in *Brug,* this Court stated: "[i]f any member of the public who might choose to invest in [the defendant's] stock were to qualify as part of a protected class, then the 'limited group' requirement would be meaningless." *Id. See also In re Wyse Technology Sec. Litig.,* 744 F.Supp. 207, 209 (N.D.Cal.1990) ("[t]ort claims of negligent misrepresentation cannot be made on the basis of alleged misstatements in routine public business announcements"); *Brickman v. Tyco Toys, Inc.,* 722 F.Supp. 1054, 1062 (S.D.N.Y.1989) (a press release, quarterly reports and a Form S–1 Registration Statement cannot form the basis of a negligent misrepresentation claim because defendants owe a duty only to persons identifiable before the alleged injury occurs).

Plaintiffs acknowledge the force of defendants' position but counter by arguing the matter is controlled by Section 552(3) of the *Restatement (Second) of Torts* which states:

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

*Restatement (Second) of Torts* § 552(3) (1977). Accordingly, plaintiffs argue that defendants were under a public duty imposed by, *inter alia,* the SEC, to fully disclose material information regarding Delmarva's financial conditions and prospects. Therefore, plaintiffs conclude Section 552(3) of the *Restatement* establishes that users of this information, such as potential investors, constitute a class of persons for whose benefit that duty was created. If plaintiffs' position were accepted, Section 552(3) would have to be construed as making defendants liable to all potential investors in Delmarva stock.

---

**31.** Section 15 reads as follows:

Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with one or more other persons by or through stock ownership, agency, or otherwise, *controls any person liable under section 11 or 12,* shall also be liable jointly and severally with and to the same

extent as such controlled person is liable, unless the controlling person had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77*o* (1988) (emphasis added).

Not surprisingly, plaintiffs have cited no case support for such a virtually limitless expansion of exposure to civil liability. In the same vein, adoption of plaintiffs' position would yield the undesirable result that those who committed a negligent misrepresentation in corporate publicly filed documents would be liable to a broader universe of plaintiffs than if the same statements constituted fraud. It is probably for this reason that the Restatement commentary to Section 552(3) notes the rule *"may* apply to private individuals or corporations who are required by law to file information for the benefit of the public." (Emphasis added). It is concluded Section 552(3) should not apply in this case. Accordingly, Count III will be dismissed for lack of standing.

 Even if plaintiffs had standing to assert a negligent misrepresentation claim, there is another pleading deficiency in Count III. Restatement Section 552 requires plaintiffs suffer a "pecuniary loss." Count III only alleges "plaintiffs ... have been damaged in an amount which cannot presently be determined." The Amended Complaint fails to allege any pecuniary loss. While for Section 10(b) purposes phraseology such as "common stock fell in value" or suffered a "deterioration in value" (Am.Compl., ¶ 44) might suffice when market forces mask what would be a drop in share price,[32] "pecuniary loss" requires an actual loss to Delmarva shareholders as evidenced by a decline in price of Delmarva stock. Count III will be dismissed because of lack of standing and plaintiffs' failure to plead the requisite injury.

## VII. Count IV: Proxy Violation Claim

 Rule 14a–9 promulgated under Section 14(a) of the Exchange Act prohibits material misrepresentations in the solicitation of proxies. 17 C.F.R. § 240.14(a)–9. Plaintiffs allege that the Proxy Statements and accompanying Annual Reports of Delmarva failed to disclose during the putative

Class Period the true facts concerning the financial and operating conditions and prospects of the three joint ventures. (Am. Compl. ¶ 85). Plaintiffs contend that these alleged omissions constitute a failure on the part of the director defendants and their co-defendants to fulfill their fiduciary duties with a resultant undermining of the integrity of the corporate suffrage process.

Plaintiffs' reliance, however, on Section 14(a) and Rule 14a–9 is misplaced because it is premised on misstatements or omissions in Delmarva's Annual Report. "[N]o liability may be imposed under Federal proxy rules other than Rule 14a–3, for any false or misleading statement or material omission contained in the corporation's annual report...." *Dillon v. Berg,* 326 F.Supp. 1214, 1231 (D.Del.1971), *aff'd,* 453 F.2d 876 (3d Cir.1971). Therefore, Delmarva's Annual Reports must be disregarded for purposes of determining whether the proxy materials violated Section 14(a) or the rules promulgated thereunder.[33]

 Moreover,

Section 14 protects investors in their status as shareholders by providing a cause of action for misleading proxy statements which affect the corporate voting process. In order to state a cause of action under § 14(a), a stockholder must establish that he was damaged by an infringement of corporate suffrage rights. Therefore, a plaintiff can only establish a § 14(a) claim based on a purchase or sale of securities if the purchase or sale was the result of a corporate transaction whose approval was obtained by a misleading proxy statement, e.g., a traditional merger.... If plaintiffs relied on a misleading proxy statement in deciding whether to purchase or sell stock independent of any corporate vote or transaction, plaintiffs remedies lie in §§ 10(b) or 18(a).

*In re Penn Central Securities Litigation,* 347 F.Supp. 1327, 1342 (E.D.Pa.1972), *aff'd,* 494 F.2d 528 (3d Cir.1974).

---

**32.** *See supra* Notes 4–7 and accompanying text.

**33.** Plaintiffs do not allege that the Annual Reports "were incorporated by reference" into the proxy solicitation materials. An annual statement which "accompanies" proxy materials is

not equivalent to one which has been incorporated by reference into the proxy materials. *Dillon v. Berg, supra* at 1230–31; *Markewich v. Adikes,* 422 F.Supp. 1144, 1147 (E.D.N.Y.1976).

In this case, plaintiffs have not alleged their purchase of Delmarva securities was the result of a corporate transaction whose approval by shareholders was obtained by a misleading proxy statement. It follows there is no infringement of corporate suffrage rights.

Plaintiffs argue that the alleged misrepresentations and omissions enabled individual defendant-directors to be reelected and maintain their positions with Delmarva. The weakness of this argument is that liability under Section 14a–9 has been limited to circumstances involving either corporate mergers and acquisitions, *e.g.*, *TSC Industries, Inc., supra*; *Schlick v. Penn–Dixie Cement Corp.*, 507 F.2d 374 (2d Cir. 1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); and *Penn Central Securities Litigation, supra*, or the qualifications of directors to serve as such, *e.g.*, *Mayer v. Development Corp. of America*, 396 F.Supp. 917 (D.Del.1975) (directors would dishonor voting agreement); *Cooke v. Teleprompter Corp.*, 334 F.Supp. 467 (S.D.N.Y.1971) (director convicted of bribery); *Robinson v. Penn Central Co.*, 336 F.Supp. 655 (E.D.Pa.1971) (lawsuits pending against directors). *See also Markewich v. Adikes*, 422 F.Supp. 1144, 1146 (E.D.N.Y.1976) (liability for proxy violations limited to corporate mergers and acquisitions or directors' qualifications). Plaintiffs make no direct attack on the director defendants' qualifications other than their decision to involve Delmarva in the joint ventures.[34]

Plaintiffs seek to base a proxy violation on the possibility that had the Annual Reports been more accurate, the shareholders would have been more fully informed of material facts concerning the directors' abilities. "What the cases clearly hold, however, is that in order to constitute a proxy violation an omission or misrepresentation of material fact must also relate to the purpose for which the proxies are solicited." *Markewich, supra*, at 1147. The Court has found no cases holding that the proxy rules are violated because management failed to disclose it allegedly mismanaged the company or violated fiduciary duties.[35]

Plaintiffs are attempting to convert a Section 10(b) action into a Section 14(a) claim by requiring that the proxy materials correct any and all alleged deficiencies in the annual reports. However,

> [t]o require the proxy materials to supplement the annual report would frustrate the purpose of Rule 14a–3(c) and nullify the terms of Rule 14a–3(b). . . . Therefore, the failure to update the annual report or to correct any false or misleading statements in the report or to supply any information omitted from the report cannot give rise to liability under Section 14(a). . . .

*Dillon v. Berg, supra* at 1231.

If plaintiffs' claims were held actionable under Section 14(a) of the Exchange Act, any allegation of corporate mismanagement or breach of fiduciary duty could be transformed into a Section 14(a) claim. This is clearly not what Congress intended when it enacted Section 14(a). It is held, therefore, plaintiffs have failed to state a claim for relief under Section 14(a) and Rule 14a–9 of the Exchange Act and Count IV of the Amended Complaint will be dismissed.

## VIII. Conclusion

For the reasons set forth above, all counts of the Amended Complaint will be dismissed. An appropriate order will issue.

---

**34.** Plaintiffs have not alleged that Roger Campbell, who was not a director of Delmarva, was involved in the preparation of any proxy statement and therefore he cannot be liable for a Rule 14a–9 violation.

**35.** The factual situation in *Markewich* is similar to the instant case. Plaintiff in *Markewich* contended that defendants tried to conceal from shareholders the true financial condition of an unincorporated association by furnishing untrue statements in annual reports mentioned in the proxy statement. The District Court for the Eastern District of New York dismissed that portion of the complaint asserting a Section 14(a) and Rule 14a–9 claim.